1  Nicomedes Sy Herrera (State Bar No. 275332)
   HERRERA PURDY LLP
2  1300 Clay Street, Suite 600
   Oakland, California 94612
3  Telephone: (510) 422-4700
   Email: NHerrera@HerreraPurdy.com
4
   Tejinder Singh (*Pro Hac Vice*)
5  GOLDSTEIN & RUSSELL, P.C.
   7475 Wisconsin Avenue, Suite 850
6  Bethesda, Maryland 20814
   Telephone: (202) 362-0636
7  Email: TSingh@GoldsteinRussell.com

8  Warren T. Burns (*Pro Hac Vice*)
   BURNS CHAREST LLP
9  900 Jackson Street, Suite 500
   Dallas, Texas 75202
10 Telephone: (469) 904-4550
   Email: WBurns@BurnsCharest.com
11
   *Attorneys for Plaintiff-Relator Zachary Silbersher*
12
   [Additional Counsel on the Signature Page]
13
                    **UNITED STATES DISTRICT COURT**
14                 **NORTHERN DISTRICT OF CALIFORNIA**
                       **SAN FRANCISCO DIVISION**
15

16 | UNITED STATES OF AMERICA; STATES OF | Case No.: 3:18-cv-03018-JCS |

UNITED STATES OF AMERICA; STATES OF
CALIFORNIA, COLORADO, CONNECTICUT,
DELAWARE, FLORIDA, GEORGIA, HAWAII,
ILLINOIS, INDIANA, IOWA, LOUISIANA,
MICHIGAN, MINNESOTA, MONTANA,
NEVADA, NEW JERSEY, NEW MEXICO,
NEW YORK, NORTH CAROLINA,
OKLAHOMA, RHODE ISLAND,
TENNESSEE, TEXAS, VERMONT, AND
WASHINGTON; THE COMMONWEALTHS
OF MASSACHUSETTS AND VIRGINIA; AND
THE DISTRICT OF COLUMBIA,

*ex rel.* ZACHARY SILBERSHER,

                    Plaintiffs,

           v.

ALLERGAN PLC, ALLERGAN, INC.,
ALLERGAN USA, INC., ALLERGAN SALES,
LLC, FOREST LABORATORIES HOLDINGS,
LTD., ADAMAS PHARMA, AND ADAMAS
PHARMACEUTICALS, INC.,

                    Defendants.

Case No.: 3:18-cv-03018-JCS

**PLAINTIFF-RELATOR ZACHARY SILBERSHER'S OPPOSITION TO ADAMAS DEFENDANTS' MOTION TO DISMISS (DKT. 68)**

Hon. Joseph C. Spero

Courtroom G, 15th Floor
Phillip Burton Federal Building
450 Golden Gate Avenue
San Francisco, CA 94102

Hearing Date: October 25, 2019
at 9:30 a.m.(Dkt. 76)

Action Filed: April 25, 2018

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 5

ARGUMENT ......................................................................................................................... 6

   I.     Adamas Played an Important Role in Fraudulently Procuring and Asserting the
Went Patents ......................................................................................................................... 6

   II.    The Complaint Pleads False Claims and Statements ............................................ 8

     A.   Promissory Fraud or Fraud in the Inducement.................................................. 8

     B.   Implied Certification ...................................................................................... 10

     C.   The Fraudulent Patent Applications Are Also False Claims ........................... 11

   III.   The Complaint Pleads Materiality ..................................................................... 13

   IV.   The Complaint Pleads Scienter ......................................................................... 14

   V.    The Complaint Satisfies Rule 9(b) ..................................................................... 14

   VI.   Adamas's Public Disclosure Argument Lacks Merit .......................................... 16

CONCLUSION .................................................................................................................... 18

RELATOR'S OPPOSITION TO ADAMAS DEFENDANTS' MOTION TO DISMISS

1

2

## **TABLE OF AUTHORITIES**

3

### CASES

4

*Amphastar Pharms. Inc. v. Aventis Pharma SA*,
  856 F.3d 696 (9th Cir. 2017) ................................................................................................16

*Avid Identification Sys., Inc. v. Crystal Import Corp.*,
  603 F.3d 967 (Fed. Cir. 2010)................................................................................................7

*Breville Pty Ltd. v. Storebound LLC*,
  No. 12-CV-01783-JST, 2013 WL 1758742 (N.D. Cal. Apr. 24, 2013)................................16

*Brown v. Duchesne*,
  19 How. 183 (1857) ..............................................................................................................12

*Cleveland v. United States*,
  531 U.S. 12 (2000)................................................................................................................12

*Ebeid ex rel. U.S. v. Lungwitz*,
  616 F.3d 993, 998–99 (9th Cir. 2010) ..................................................................................14

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722 (2002)..............................................................................................................12

*Hascoet ex rel. U.S. v. Morpho S.A.*,
  No. 17-16915, 2019 WL 2213322 (9th Cir. May 22, 2019)....................................................7

*Horne v. Dep't of Agric.*,
  135 S. Ct. 2419 (2015)..........................................................................................................12

*In re Rembrandt Techs. LP Patent Litig.*,
  899 F.3d 1254 (Fed. Cir. 2018).............................................................................................7

*ICU Med., Inc. v. B. Braun Med. Inc.*,
  2005 WL 588341 (N.D. Cal. Mar. 14, 2005)..........................................................................3

*Loughrin v. United States*,
  573 U.S. 351 (2014)..............................................................................................................12

*McNally v. United States*,
  483 U.S. 350 (1987)..............................................................................................................12

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
  139 S. Ct. 1652 (2019)..........................................................................................................12

*Mortgs., Inc. v. United States Dist. Court*,
  934 F.2d 209 (9th Cir. 1991) ..................................................................................................7

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)..............................................................................................................12

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Oil States Energy Servs., LLC v. Greene's Energy Grp.*, LLC,
   138 S. Ct. 1365 (2018) ................................................................................12, 13

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
   563 U.S. 401 (2011) ............................................................................................17

*See U.S.* ex rel. *Mateski v. Raytheon Co.*,
   816 F.3d 565 (9th Cir. 2016) .............................................................................18

*Semiconductor Energy Laboratory Co. v. Samsung Electronics Co.*,
   204 F.3d 1368 (Fed. Cir. 2000).....................................................................12, 13

*State ex rel. Bartlett v. Miller*,
   243 Cal. App. 4th 1398, 197 Cal. Rptr. 3d 673 (2016)......................................18

*U.S.* ex rel. *Campie v. Gilead Scis., Inc.*,
   862 F.3d 890 (9th Cir. 2017) ..................................................................... passim

*U.S.* ex rel. *Chandler v. Cook Cty., Ill.*,
   277 F.3d 969 (7th Cir. 2002) .............................................................................13

*U.S.* ex rel. *El-Amin v. George Washington Univ.*,
   533 F. Supp. 2d 12 (D.D.C. 2008) ....................................................................13

*U.S.* ex rel. *Feldman v. van Gorp*,
   No. 03 CIV. 8135 (WHP), 2010 WL 2911606 (S.D.N.Y. July 8, 2010)............13

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) ...................................................................2, 6, 8, 9

*U.S. ex rel. Integra Med Analytics LLC v. Providence Health & Servs*,
   No. CV 17-1694 PSG (SSX), 2019 WL 3282619 (C.D. Cal. July 16, 2019)...................14, 15, 17, 18

*U.S. ex rel. Marcus v. Hess*,
   317 U.S. 537 (1943).............................................................................................8

*U.S.* ex rel. *Ryan v. Endo Pharmaceuticals, Inc.*,
   27 F. Supp. 3d 615 (E.D. Pa. 2014) ...................................................................17

*U.S.* ex rel. *Spay v. CVS Caremark Corp.*,
   913 F. Supp. 2d 125 (E.D. Pa. 2012) .................................................................16

*United States ex rel. Polukoff v. St. Mark's Hosp.*,
   895 F.3d 730 (10th Cir. 2018) .............................................................................7

*United States v. DynCorp Int'l, LLC*,
   253 F. Supp. 3d 89 (D.D.C. 2017) ......................................................................9

*Universal Health Servs., Inc. v. U.S.* ex rel. *Escobar*,
   136 S. Ct. 1989 (2016) .........................................................................................2

**STATUTES**

31 U.S.C. § 3729(b)(2)(A) .......................................................................11, 12

31 U.S.C. § 3730(e)(4)(A) ............................................................................................3, 16

31 U.S.C. § 3730(e)(4)(A)(i) ....................................................................................3, 16, 17

31 U.S.C. §§ 3729(a)(1)(A), (B) .....................................................................................3, 7

31 U.S.C. §§ 3729-3733 .......................................................................................................1

35 U.S.C. § 261 ...................................................................................................................12

3730(e)(4)(A)(ii), (iii) .......................................................................................................17

**RULES**

Fed. R. Civ. P. 9(b) ............................................................................................................14

RELATOR'S OPPOSITION TO ADAMAS DEFENDANTS' MOTION TO DISMISS

**INTRODUCTION**

Adamas[1] in its motion to dismiss (Dkt. 68) (the "MTD") repeats many of the same arguments that Allergan makes in its motion to dismiss (Dkt. 63). Those arguments lack merit for the reasons set forth in Relator's brief in opposition to the motion to dismiss filed by Allergan ("Pl. Opp. to Allergan MTD"). (Dkt. 80) In this opposition brief, Relator focuses on addressing arguments that are either specific to Adamas or which were not raised in Allergan's motion to dismiss.

As more fully set forth in Relator's brief opposing Allergan's motion, the First Amended Complaint (Dkt. 12) ("Complaint") alleges that Defendants[2] fraudulently obtained patents to unlawfully extend their drug monopolies on Namenda XR and Namzaric. Those two drugs cost more than $450 for a one-month prescription. Medicare and Medicaid paid over $3.1 billion for them from 2014 through 2017 (the last date full data is available). Generic competition would have decreased Defendants' market share by as much as 90% and brought market prices down by as much as 90%. Through their fraudulent scheme, Defendants unlawfully extended their patent monopoly and continued charging the government monopoly prices well after the initial patents for the drugs expired. Defendants reported those prices to the government as if they were fair and reasonable when Defendants knew they were unlawfully inflated through their fraudulent scheme. Defendants' "fraudulent course of conduct" thus caused many government programs to pay too much for the drugs, violating the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733.  *See U.S.* ex rel. *Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017).

Defendants' conduct gives rise to liability under three independent theories. First, Defendants committed a fraud on the Patent Office that tainted subsequent claims for payment, rendering them fraudulent under the FCA. As the Ninth Circuit has held in indistinguishable circumstances, this misconduct is actionable under the "promissory fraud" or "fraud in the inducement" doctrine. *See Campie,* 862 F.3d at 904 (holding that fraud on the Food and Drug Administration ("FDA") during the

---

[1] Adamas Pharma, LLC and Adamas Pharmaceuticals, Inc.

[2] Allergan, Inc., Allergan USA, Inc., and Allergan Sales, LLC, and Forest Laboratories Holdings, Ltd. (collectively, "Allergan"); and Adamas Pharma and Adamas Pharmaceuticals, Inc. (together, "Adamas") ("Allergan" and "Adamas" together, "Defendants").

drug approval process gave rise to a promissory fraud claim vis-à-vis subsequent claims for payment relating to the affected drugs); *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006) (holding that fraudulently obtaining agreement with the Department of Education gave rise to an FCA claim with respect to downstream grants; and further holding that "the precise logistical details of how the claim is made—with respect to timing, for instance, or the number of stages involved—are immaterial" as long as the "false statement is integral to a causal chain leading to payment").

Second, while negotiating the prices the government would pay for Namenda XR and Namzaric, Defendants submitted pricing information to the government that a government purchaser reasonably, but incorrectly, would have understood to reflect fair market conditions—while omitting that the prices were in fact tainted by fraud. This is actionable under the FCA pursuant to the implied certification doctrine. *See Universal Health Servs., Inc. v. U.S.* ex rel. *Escobar*, 136 S. Ct. 1989, 2000-01 (2016); *Campie*, 862 F.3d at 901. These two theories of liability were fully explained Section III of Relator's opposition to Allergan's motion to dismiss. (Dkt. 80, at pp. 15-20)

Third, the Complaint's well-pleaded facts also establish that the patent applications themselves constituted false claims, and the false statements made during patent prosecution were material to those claims. 31 U.S.C. § 3729(a)(1)(A), (B). Adamas emphasizes in its opposition that, unlike Allergan, it was not involved in the last step of the fraudulent scheme because it left Allergan to submit claims to the government and list the drugs on the Federal Supply Schedule ("FSS"). (MTD, at 8) But as explained more fully below, a "claim" under the FCA includes any request for property—and patents are property. Thus, Defendants' patent applications were false claims, which proximately caused the government to suffer significant damages. Adamas was clearly involved in those false claims. None of Defendants' arguments relating to materiality or Rule 9 refute liability with respect to this basis for liability.[3]

Moreover, Adamas was directly involved not only in fraudulently procuring the Went Patents, but also in asserting them against generic competitors that filed Abbreviated New Drug Applications

---

[3] This argument also applies to Allergan with respect to the false statements that its predecessor in interest, Forest, made to the Patent Office.

1   ("ANDAs") to introduce bioequivalent alternatives to Namenda XR and Namzaric. (Complaint, ¶¶ 58-

2   90; 104-09)[4] These acts—obtaining the patents and asserting them against generic competitors—were

3   key parts of the fraudulent scheme because they enabled the subsequent fraudulent claims for

4   payment. Thus, it makes no difference whether Adamas itself submitted the actual invoices or

5   presented the drugs for listing on the FSS. Adamas is jointly and severally liable with Allergan for

6   materially participating in, and benefiting from, the fraudulent scheme alleged in the Complaint.

7   Indeed, the FCA specifically prohibits misconduct that "causes" a "false or fraudulent claim" or

8   "statement material to a false or fraudulent claim" to be made or presented to the government—and

9   not just the actual submission of such claim or material statement. 31 U.S.C. §§ 3729(a)(1)(A), (B).

10      Adamas says that the Complaint should be dismissed under the FCA's public disclosure bar, 31

11   U.S.C. § 3730(e)(4)(A). In addition to repeating Allergan's arguments, Adamas adds that Defendants'

12   fraud was publicly disclosed by generic competitors that asserted inequitable conduct defenses to

13   patent infringement actions Defendants filed against them beginning in 2014. Adamas also says that

14   those pleadings were disclosed to the Patent Office in 2016 (without description, along with thousands

15   of other listed references) in subsequent patent applications not relevant to this suit. (MTD, at 7) This

16   argument fails because patent infringement actions are civil proceedings in which the government is

17   not a party. Congress specifically excluded information disclosed in such proceedings from the scope

18   of the public disclosure bar in 2010. 31 U.S.C. § 3730(e)(4)(A)(i). The fact that those pleadings were

19   later listed in a subsequent patent application does not help, because information disclosed in patent

20   prosecution proceedings are similarly excluded from the public disclosure bar under

21   § 3730(e)(4)(A)(i), as amended in 2010. That is because, like patent infringement actions, patent

22   prosecution proceedings (which are *ex parte*) are administrative proceedings in which the government

23   is not a party. *See, e.g., ICU Med., Inc. v. B. Braun Med. Inc.*, 2005 WL 588341, at *13 (N.D. Cal.

24   Mar.14, 2005). Accepting Adamas's argument would undermine Congress's decision to exclude

25

26   [4] The documents that Adamas asks the Court to take judicial notice confirm that Adamas
    Pharmaceuticals, Inc. and Allergan's predecessor in interest, Forest Laboratories, Inc. (with Forest
27   Laboratories, LLC, "Forest"), asserted the fraudulent patents to block generic competitors. *See, e.g.,*
    Portelli Decl. Exs. 1-4.

28                                              - 3 -

1    information disclosed in such proceedings, in conflict with the statutory text, precedent, and

2    Congress's policy objectives.

3         In any event, the mere listing of the pleadings filed in the infringement actions in a subsequent

4    and completely irrelevant patent application does not disclose anything material about the fraud

5    alleged in the Complaint. Indeed, the pleadings asserting inequitable conduct constituted two

6    references buried among thousands of citations summarily listed in two Information Disclosure

7    Statements filed by Adamas in the other patent applications—years after the last of the Went Patents

8    and the '009 Patent had been granted.[5] None of the citations to the pleadings contain any description

9    or indication of their contents. Thus, even if the Information Disclosure Statements counted as "public

10   disclosures"—and they do not—such filings did not disclose anything material about the fraud alleged

11   in the Complaint.

12        Failing to come up with anything new that would merit dismissal of the Complaint, Adamas

13   resorts to the discredited canard that this suit is "parasitic." Adamas says that "[p]arasitic lawsuits" are

14   "Mr. Silbersher's business model." (MTD, at 10) It is true that this case involves a parasitic business

15   model—but that description aptly describes Defendants' scheme, and not Relator's suit.[6] Relator has

16   brought a meritorious action—which alleges with specificity a fraudulent course of conduct that

17   Defendants do not deny on the merits— to recover billions of dollars that *Defendants* overcharged

18   government healthcare programs through their fraudulent scheme. There is no reason to believe

19   anybody in the government was aware of this fraud, much less that the massive overcharges would

20   ever have been recovered if Relator had not diligently uncovered it and filed this action. A parasite

21   feeds on a host; and here, Defendants are the ones unlawfully enriching themselves with government

22   healthcare funds, and Mr. Silbersher is trying to stop it and recover the billions that Defendants

23   wasted.

24   _____

25   [5] *See* Declaration of Anthony L. Portelli dated June 21, 2019, Exs. 5 & 6. (Dkt. 69)

26   [6] Indeed, Allergan helpfully points out that the New York Attorney General and several antitrust
     plaintiffs previously sued Defendants for unlawfully excluding generic competitors from introducing

27   lower-priced generic drugs in connection with Namenda IR, the previous version of Namenda XR. *See*
     Pl. Opp. to Allergan MTD, Dkt. 80, at pp. 22-23; *see also* Allergan's MTD, Dkt. 63, at p. 14.

28                                              - 4 -

RELATOR'S OPPOSITION TO ADAMAS DEFENDANTS'          CASE NO. 3:18-CV-03018-JCS
MOTION TO DISMISS

## BACKGROUND

The relevant facts and background are fully set forth Relator's opposition brief to Allergan's motion to dismiss, and Relator incorporates them here. (Dkt. 80, at pp. 4-7) The relevant facts as they pertain to the additional arguments raised in Adamas's motion are set forth below.

Adamas is the original owner of the Went Patents, which are named after Dr. Gregory T. Went, the founder and CEO of Adamas. (Complaint, ¶ 58) Adamas entered into a commercialization and development agreement with Allergan's predecessor in interest, Forest, and granted Forest an exclusive license with respect to all of the Went Patents in November 2012. (Complaint, ¶ 58) Together, Adamas and Allergan developed and commercialized Namenda XR and Namzaric. (Complaint, ¶¶ 49, 53) Adamas also conducted the clinical study known as ME-110 (the "ME110 Study"). The Complaint alleges that the Went Patents were fraudulently obtained through Dr. Went's misrepresentations concerning the results of the ME110 Study, which was the basis upon which Defendants tricked the Patent Office into issuing the Went Patents. (Complaint, ¶¶ 63-90)

The Complaint alleges that Defendants used their fraudulently obtained patents to block generic competition for Namenda XR and Namzaric. It alleges that sixteen generic manufacturers had filed ANDAs and were prepared to generic alternatives to Namenda XR by the end of December 2013, and to Namzaric by July 13, 2015. (*Id.*, at ¶¶ 104-05 & 108-09) However, Defendants delayed generic entry by listing their patents in the Orange Book and initiating infringement actions asserting the Went Patents and the '009 Patent against generic competitors. (*Id.*, at ¶¶ 104-109; *see also* n.4, *supra*)

This fraud harmed the government in two ways. First, government health programs frequently favor less expensive generic drugs. (*Id.*, ¶ 121-23, 130) By unlawfully excluding generic competitors from the market altogether, Defendants denied the government that choice and significant cost savings. Second, the prices the government pays for drugs are based on market prices. Indeed, the government is prohibited from paying more than a percentage (76%) of the average manufacturer's price for the drugs under Medicaid and certain other government programs, such as the Veterans' Health Administration. (*Id.*, at ¶¶ 112-16) Thus, when a drug manufacturer unlawfully manipulates the market price, it necessarily also manipulates the price the government will pay.

- 5 -

1

**ARGUMENT**

2      As the Ninth Circuit has repeatedly confirmed, the FCA is "intended to reach all types of fraud,

3  without qualification, that might result in financial loss to the Government." *Hendow*, 461 F.3d at

4  1170–71; *see also Campie*, 862 F.3d at 899 ("We construe the Act broadly"). To allege an FCA claim,

5  Relator must plead: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3)

6  that was material, causing (4) the government to pay out money or forfeit moneys due." *Campie*, 862

7  F.3d at 899. As explained in the Introduction, and as established by the allegations in the Complaint

8  and summarized in the Background section, this case falls squarely within the heartland of the FCA:

9  Defendants committed fraud to cause the government to pay more for medicines.

10      The Complaint alleges that Defendants did three fraudulent things, each of which tainted

11  claims for payment made to the government: (1) Defendants got their patents through fraud on the

12  Patent Office; (2) Defendants knowingly used these invalid patents to block or delay generic

13  competition, inflating the market price and securing their market share through fraud (and thus

14  denying government payors choice in the marketplace); and (3) Defendants provided tainted and

15  misleading pricing information to government payors, leading to contracts that caused the government

16  to pay Defendants more than it otherwise would have. This conduct gives rise to liability under the

17  theories of promissory fraud (whereby upstream fraud on the patent office tainted downstream claims

18  for payment), implied false certification (for misleading the government into believing that the prices

19  offered to the market were not tainted by fraud), and factually false claims (the patent applications

20  themselves, which were obtained through misrepresentations and misleading omissions). Each of

21  these theories renders Adamas liable for the government's damages and civil monetary penalties.

22
23

**I.      Adamas Played an Important Role in Fraudulently Procuring and Asserting the Went Patents**

24      Adamas does not dispute the Went Patents were obtained by fraud because Dr. Went—

25  Adamas's founder and CEO—lied about the results of the ME110 Study, and his lies caused the Patent

26  Office to issue the Went Patents. Instead, Adamas argues that the Complaint is supposedly devoid of

27  any facts suggesting Adamas provided inaccurate or misleading pricing information to the government

28

- 6 -

in connection with drug pricing. (MTD, at 3 & 8) Instead, it points the finger at Allergan, which was responsible for marketing Namenda XR and Namzaric.

Adamas's argument ignores the statutory text, which applies not only to any person who submits a false claim, but also to any person who "causes" such a claim to be submitted. *See* 31 U.S.C. § 3729(a)(1)(A), (B). Defendants' fraudulent scheme included obtaining the patents, and then wrongfully asserting those patents against generic competitors to force the government to buy from Defendants at inflated prices. Adamas played key roles in these critical parts of the fraud. Through its misconduct, Adamas "caused" the submission of false claims to the government. *See Campie*, 862 F.3d 890, 903  (holding that as long as a defendant's false statements are an essential part of a causal chain leading to payment, the defendant is liable under the FCA); *see also, e.g., Mortgs., Inc. v. United States Dist. Court*, 934 F.2d 209, 212 (9th Cir. 1991) ("Where one or more persons have committed a fraud upon the government in violation of the FCA, each is joint and severally liable for the treble damages and statutory penalty."). Adamas cannot evade culpability simply by claiming it was not active in the last step in the causal chain (although Adamas benefited from it). And its reliance on *Hascoet ex rel. U.S. v. Morpho S.A.*, No. 17-16915, 2019 WL 2213322 (9th Cir. May 22, 2019) is inapposite, because the Complaint here pleads with specificity Adamas's critical involvement in the fraudulent scheme.

Moreover, Dr. Went's fraud on the Patent Office—which Adamas's motion does not contest—is chargeable to all those who acquire or enforce the patents. *See In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1272 (Fed. Cir. 2018) (affirming imposition of sanctions on purchaser of a patent based on prior owner's inequitable conduct); *Avid Identification Sys., Inc. v. Crystal Import Corp.*, 603 F.3d 967, 973 (Fed. Cir. 2010) ("If an individual who is substantively involved in the preparation or prosecution of an application fails to comply with his duty of candor, then that individual's misconduct is chargeable to the applicant for the patent, and the applicant's patent is held unenforceable."). It is surely chargeable to Adamas, because Dr. Went was its CEO and founder, and the patents were assigned to Adamas in the first instance. *Cf. United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 n.9 (10th Cir. 2018), *cert. dismissed* 2019 WL 188163 (U.S. June 10,

1    2019) (holding that FCA liability for a corporation can be established if any of its agents or employees

2    acting within the scope of their authority knew of the fraud).

3    **II.      The Complaint Pleads False Claims and Statements**

4    Adamas focuses its argument on its mistaken belief that Relator solely "relies on the implied

5    certification doctrine in an unsuccessful attempt to satisfy the FCA's falsity element." (MTD, at 2)

6    While that is one theory upon which FCA liability is based, Adamas misses the Complaint's well-

7    pleaded allegations supporting liability based on promissory fraud (*i.e.,* Defendants' upstream fraud on

8    the Patent Office tainted all downstream claims for payment); and express fraud (*i.e.,* the fraudulent

9    patent filings directly give rise to FCA liability as false "requests" for "property").

10   **A.  Promissory Fraud or Fraud in the Inducement**

11   The FCA is broadly construed to apply to situations like here in which an upstream fraud is

12   used to facilitate downstream claims. *See Campie*, 862 F.3d at 903; *Hendow*, 461 F.3d at 1174; *see*

13   *also U.S.* ex rel. *Marcus v. Hess*, 317 U.S. 537, 539 & n.1, 542-44 (1943); *see generally*, Pl. Opp. to

14   Allergan's MTD, Dkt. 80, at pp. 2, 8, 15, 18. Adamas's arguments do not address liability on this

15   basis, and Defendants fail to draw the necessary distinction between this basis for liability and implied

16   certification. This is fatal to their defenses.

17   Although there is some overlap between fraud in the inducement and implied false

18   certification, the two theories address distinct misconduct. Fraud in the inducement occurs when a

19   defendant fraudulently induces the government to confer a benefit on the defendant that taints

20   subsequent claims for payment. The best example in this Circuit is the court of appeals' decision in

21   *Campie*. There, the relator alleged, among other things, that the defendant fabricated test results in

22   order to deceive the FDA into approving the use of active pharmaceutical ingredients from a facility in

23   China. The district court had dismissed the claim because the alleged misrepresentations were not

24   made to the paying agencies that bought the drugs (the same paying agencies at issue here), deeming

25   the relationship between the misrepresentations and the claims for payment too attenuated to support

26   liability. The Ninth Circuit reversed, explaining that "the False Claims Act imposes no such

27   limitation" that false claims only arise when misrepresentations are made to paying agencies. 862 F.3d

28   - 8 -

at 903. The court of appeals explained that "[i]t is not the distinction between the agencies that matters, but rather the connection between the regulatory omissions and the claim for payment." *Ibid*. When "a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork." *Ibid* (*quoting Hendow*, 461 F.3d at 1174).

The misstatements to the FDA in *Campie* established an FCA claim based on the doctrine of promissory fraud (or fraud in the inducement), which holds that "subsequent claims are false because of an original fraud." 862 F.3d at 902. The defendant's misrepresentations to the FDA in *Campie* enabled the defendant to seek government payments for the drugs. *Id*. at 904. Those misrepresentations meant that "each claim was fraudulent even if false representations were not made therein." *Ibid*. In other words, the upstream fraud tainted the downstream claims.

*Campie* controls here. Defendants were only able to submit the extremely lucrative claims for payment that they later submitted—*i.e.*, to charge the prices they charged, and to monopolize the sale of these drugs—because they first defrauded the Patent Office. That fraud, like the fraud on the FDA in *Campie*, was integral to the causal chain leading to the claims for payment, and it therefore taints those claims.

Similarly, in *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89 (D.D.C. 2017), the defendant told the government during contract negotiations that it would charge labor rates based on "historical data." *Id*. at 106. Without telling the government, the defendant also charged its overhead and profit on top of inflated labor rates. *Ibid*. The court held that this conduct was actionable promissory fraud because, by omitting material information concerning its rates, the defendant skewed the initial price negotiations with the government and caused it to agree to pay higher prices in subsequent claims than what the government otherwise would have paid. *Id*. at 107-08. Again, the upstream or original fraud resulted in price inflation that were incorporated in downstream or subsequent claims, and the FCA provided a remedy. The same principle applies to this case as well.

- 9 -

### B.  Implied Certification

Adamas argues that the implied certification doctrine does not apply because, according to Adamas, the GSA is indifferent about whether the prices the government pays are actually "fair and reasonable." (MTD, at 18-19) All the GSA wants to know, says Adamas, is whether the government is paying the same prices as commercial payors. So long as a seller accurately reports the prices that it charges to commercial payors, it has satisfied all of its regulatory obligations—even if that price is tainted by fraud.

On its face, that argument is implausible because *no reasonable payor* would be indifferent about whether it was paying a price for drugs that had been inflated 650% due to fraud. (*See* Complaint ¶¶ 155). The GSA seeks information about what commercial payors are paying because it reasonably assumes commercial payors are paying fair market value. But when, as here, a defendant knows that it has distorted the market price through a fraudulently obtained patent monopoly, the defendant knows that the government's reasonable assumption is false. In this context, blithely reporting the prices that commercial payors pay—without disclosing that the prices have been unlawfully inflated—is precisely the same sort of misleading half-truth the Supreme Court found actionable in *Escobar*. There, the defendant submitted claims for reimbursement using billing codes corresponding to the provision of counseling services, such as "Family Therapy" by "Social Workers, Clinical." *See* 136 S. Ct. at 1997 & 2000. The Court held that the claims were actionable because the use of the billing codes was "clearly misleading in context. Anyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably—but wrongly—conclude that" the social worker was qualified and licensed under Massachusetts law. *Id.* at 2000. The social worker was not licensed in Massachusetts, and therefore the use of the billing codes "without disclosing [the defendant's] many violations of basic staff and licensing requirements . . . constituted misrepresentations" actionable under the FCA. *Id.* at 2000-01. In so holding, the Supreme Court stressed that courts should not "adopt a circumscribed view of what it means for a claim to be false or fraudulent." *Id.* at 2002 (quotation marks omitted).

- 10 -

Under *Escobar*, Defendants' statements to the GSA are actionable here. Anybody receiving Defendants' reported "lowest price charged to any commercial customer" would probably—but wrongly—conclude that such price reflected fair market conditions. This is especially true because the government's specific instructions made absolutely clear that Defendants' reported price would serve as the basis for ensuring that the price the government was charged for the medicines remained "fair and reasonable throughout the life of the contract." (Complaint, ¶ 112) Defendants' statements, like the statements in *Escobar*, were clearly misleading in context. This also answers Adamas's argument that to state an implied certification claim, the claim must make a specific representation about the goods and services provided, while failing to disclose material noncompliance with a regulatory requirement that renders the specific representations misleading. In this case, Defendants specifically provided the government the best commercial prices charged for Namenda XR and Namzaric to ensure the government paid "fair and reasonable" prices for them, without disclosing that the reported prices were inflated tenfold by Defendants' fraudulently obtained patent monopoly.

## C. The Fraudulent Patent Applications Are Also False Claims

The discussion so far has focused on the claims for payment submitted to government health care programs. As explained above, Adamas is jointly and severally liable for these claims, regardless of whether Adamas directly submitted claims to the government. Additionally, the facts alleged in the Complaint support Adamas's liability for expressly false misrepresentations because the fraudulent patent applications themselves constituted false claims.

While most FCA claims are predicated on claims for payment of money, the statute sweeps far more broadly. Thus, a "claim" is defined as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—(i) is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A). Under this plain language, an application for a patent fits the definition of a claim because it is a "request" for "property" that is "presented to an officer, employee, or agent of the United States." The only remaining question is whether a patent constitutes "property" under the FCA.

1    Patents are traditionally described as "intellectual property," because by their terms, patents

2 "claim" inventions from the public domain for the exclusive benefit of the patentee. As the Supreme

3 Court has explained, patents create a property right in the form of a public franchise. *See Oil States*

4 *Energy Servs., LLC v. Greene's Energy Grp.*, LLC, 138 S. Ct. 1365, 1373-75 (2018).[7] Indeed, the

5 Patent Act expressly provides that "[s]ubject to the provisions of this title, patents shall have the

6 attributes of personal property." 35 U.S.C. § 261. Thus, patent owners have the traditional powers

7 associated with property rights, including, most importantly, the power to exclude others from

8 practicing their inventions.

9    Adamas's fraudulent patent application therefore constitutes an independent violation of the

10 FCA, and it is irrelevant that Adamas did not directly submit any claims to the government.[8] This

11 _____

12 [7] The Supreme Court has confirmed, time and again, that patents are property. *See, e.g., Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1659 (2019); *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015); *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *Festo Corp. v.*

13 *Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 730 (2002). Indeed, the Court's precedents to this effect go back over a century. *See, e.g., Brown v. Duchesne*, 19 How. 183, 197 (1857).

14 [8] We anticipate that Adamas may cite *Semiconductor Energy Laboratory Co. v. Samsung Electronics Co.*, 204 F.3d 1368, 1380 (Fed. Cir. 2000), *amended* (Apr. 5, 2000). There, the Federal Circuit held

15 that inequitable conduct on the Patent Office could not establish the predicate offenses of mail fraud and wire fraud for a RICO claim. The court determined that in the context of those statutes, a claim for

16 fraud required the defendant to deprive the victim of property the victim possessed, but an unissued patent is not property in the government's hands. *See ibid.* The court also rejected the claimant's

17 "attempt to analogize a patent to a franchise," which would have supported a fraud claim because circuit courts had held the fraud statutes apply to fraudulent attempts to obtain a franchise. *Ibid.*

18 For two reasons, *Semiconductor Energy Laboratory* does not control here and is not persuasive.

19 First, the mail and wire fraud statutes are different from the FCA. Those laws have long been

20 interpreted narrowly to apply only to schemes to take property in the victim's hands, and Congress has acquiesced in that interpretation. *See McNally v. United States*, 483 U.S. 350, 360 (1987) (mail fraud

21 statute was intended "to protect the people from schemes to deprive them of their money or property"); *Cleveland v. United States*, 531 U.S. 12, 19-20 (2000) (reviewing amendment history of

22 the mail fraud statute to conclude that Congress had intended to codify this understanding). In contrast with the mail and wire fraud statutes, controlling precedent holds that the FCA should be construed

23 "broadly" to achieve its remedial purpose. *Campie*, 862 F.3d at 899. That is especially the case here because Congress deliberately broadened the FCA in 2009 by adding the phrase "whether or not the

24 United States has title to the money or property" to the definition of a "claim," making it clear that fraud under the FCA is not limited to attempts to obtain property in the government's hands. 31 U.S.C.

25 § 3729(b)(2)(A). As the Supreme Court has recognized, such broadening signals Congress's intent to depart from the narrow understanding of fraud embodied in the mail and wire fraud statutes. *See*

26 *Loughrin v. United States*, 573 U.S. 351, 360 (2014) (contrasting the mail fraud statute with the bank fraud statute, which Congress had expanded, and refusing to interpret the bank fraud narrowly in a

27 manner that would "deprive that [expansion] of its full effect"). [*continued on following page*]

28                                                    - 12 -

RELATOR'S OPPOSITION TO ADAMAS DEFENDANTS'                CASE NO. 3:18-CV-03018-JCS
MOTION TO DISMISS

1    theory of FCA liability applies with equal force to Forest's conduct before the Patent Office, now

2    attributable to Allergan as Forest's successor-in-interest.

### III.    The Complaint Pleads Materiality

4        Adamas repeats the same arguments raised by Allergan with respect to materiality. For the

5    reasons set forth in Relator's opposition to Allergan's motion to dismiss, the Court should reject those

6    arguments as well. *See* Pl. Opp. to Allergan's MTD, at Section IV, pp. 20-21.

7        Adamas also argues that the government declined to intervene in this case or take action to halt

8    the payments for Namenda XR and Namzaric. According to Adamas, this must mean that the fraud

9    was not material. (MTD, at 21) Adamas's argument is based on a faulty factual premise: the

10   government does not yet *know* there was fraud. Relator will prove that at trial. Moreover, there is no

11   reason to presume that a decision by the government not to assume control of the suit is a commentary

12   on the suit's merits: "The Justice Department may have myriad reasons for permitting the private suit

13   to go forward including limited prosecutorial resources and confidence in the relator's attorney." *U.S.*

14   *ex rel. Chandler v. Cook Cty., Ill.,* 277 F.3d 969, 974 (7th Cir. 2002), *aff'd,* 538 U.S. 119 (2003).

15   Assuming the government looked unfavorably upon each *qui tam* action in which it did not intervene

16   would be "antithetical to the purpose of the *qui tam* provision—to encourage private parties to litigate

17   on behalf of the government." *U.S.* ex rel. *El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12,

18   21 (D.D.C. 2008). Not surprisingly, when defendants seek to introduce the government's declination

19   at trial, courts exclude it as irrelevant. *See, e.g., U.S.* ex rel. *Feldman v. van Gorp*, No. 03 CIV. 8135

20   (WHP), 2010 WL 2911606, at *2 (S.D.N.Y. July 8, 2010). The Court should therefore reject

21   Adamas's unfounded suggestion that a government declination had anything to do with materiality.

22       Because it is at least plausible that Defendants' fraud—which the Complaint alleges had a

23   massive effect on the price the government paid for these drugs—was material to the government's

24   payment decisions, the motion to dismiss should be denied on this ground.

25   _____

26   Second, the Supreme Court has subsequently rejected the essential holding of *Semiconductor Energy* that a patent is not a franchise. *See Oil States*, 138 S. Ct. at 1373 (holding that a patent is "a specific

27   form of property right—a public franchise"). The Federal Circuit has acknowledged that fraudulently obtaining a franchise would be actionable. *See Semiconductor Energy*, 204 F.3d at 1380.

28                                              - 13 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### IV.        The Complaint Pleads Scienter

Adamas suggests that because the Complaint alleges Dr. Went actively corrected past statements to the Patent Office "on multiple occasions," the Complaint fails to plead scienter. (MTD, at 22) Relator, however, is only required to plead scienter "generally." Fed. R. Civ. P. 9(b). *See also U.S.* ex rel. *Integra Med Analytics LLC v. Providence Health & Servs.*, No. CV 17-1694 PSG (SSX), 2019 WL 3282619, at *22 (C.D. Cal. July 16, 2019) (holding that the complaint sufficiently alleged Defendants were seeking to increase Medicare revenue and were reckless). At best, Adamas's argument raises an issue of fact—implausibly. The Complaint alleges that Adamas's founder and CEO knew that he was intentionally misrepresenting the critical results of the ME110 Study, because he demonstrated knowledge of the actual results he failed to disclose. (*See, e.g.,* Complaint, ¶ 83) The Complaint also alleges that the CEO revised his original false declaration, but *not with respect to the critical misrepresentation* concerning the actual results of the ME110 Study, which he personally knew about. (Complaint, ¶¶ 80-83) This demonstrates that Adamas persisted in misleading the Patent Office on the most important facts that would have blocked the issuance of the Went Patents.

In any event, *Integra* demonstrates that the well-pleaded allegations in the Complaint easily satisfy any pleading requirements for scienter. Like the allegations in *Integra,* the Complaint's "allegations taken together are enough to give rise to a plausible inference that Defendants were primarily focused on increasing their Medicare revenue such that they at least recklessly disregarded" the obvious invalidity of the Went Patents in light of Dr. Went's knowledge of the true results of the ME110 Study, which were the exact opposite of what Adamas told the Patent Office on at least 10 separate occasions. *Integra*, 2019 WL 3282619, at *22; *see also, e.g.,* Complaint, ¶¶ 83-90; 130, 149, 152-55.

### V.        The Complaint Satisfies Rule 9(b)

Peppered throughout its brief, Adamas makes fleeting references to Rule 9(b). The Court should ignore them. Under Rule 9(b), "it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998–99 (9th Cir. 2010). That is because, as

- 14 -

1    the court recognized in *U.S.* ex rel. *Integra Med Analytics LLC v. Providence Health & Servs*, No. CV

2    17-1694 PSG (SSX), 2019 WL 3282619, at *21 (C.D. Cal. July 16, 2019), the purpose of Rule 9 is to

3    provide defendants with "sufficient notice of the allegedly fraudulent conduct."

4         Like the allegations in *Integra*, the Complaint easily satisfies Rule 9. The Complaint

5    adequately alleges the "who, what, when where, and how" of the fraud. *Id.* With respect to the fraud

6    on the Patent Office relating to the Went Patents, the "who" is Dr. Went and the patent attorneys who

7    submitted the misleading declarations on behalf of Adamas and Allergan (Complaint, ¶¶ 58-90). The

8    "what" is the fraudulent submission of test results to the Patent Office that was critical in misleading

9    the Patent Office to grant the Went Patents (*Id.*). The "when" is, *inter alia*, the specific dates between

10   November 5, 2010 through the submission of the '233 Patent application (filed on January 28, 2013)

11   (*See, e.g.,* Complaint, ¶¶ 61-63, 69, 71, 73-77, 80-82 ). The "where" is the Patent Office (*See, e.g.,*

12   Complaint, ¶ 61). The "how" is Defendants' misstating the actual results of the ME110 Study to imply

13   that the extended release formulation of Namenda XR had lower incidents of central nervous system

14   side-effects than the immediate release version, when the exact opposite was true (*See, e.g.,* Complaint

15   ¶¶ 59-63, 67-69, 74-83). Similarly, the Complaint pleads sufficient detail to put Defendants on

16   sufficient notice with respect to the fraud relating to the ''009 Patent (Complaint, ¶¶ 91-102); and the

17   listing of the drugs on the Federal Supply Schedule (Complaint, ¶¶ 111-18).[9] The Complaint also

18   alleges reliable "indicia" that false claims were submitted, detailing hundreds of thousands of false

19   claims for Medicare and Medicaid. (*See e.g.,* Complaint, ¶¶ 124-27, 132, 136)

20        By comparison, the Complaint is much more detailed than the allegations that the *Integra* court

21   found sufficient. The *Integra* court held that even though the allegations in the complaint did not

22   identify the precise individuals submitting false statements, the complaint nevertheless had sufficient

23   detail to permit Defendants to "easily determine[]" who they were, and "therefore [such detail] did not

24   need to be alleged in the complaint." 2019 WL 3282619, at *21. This is consistent with the Ninth

25   Circuit's rule that when the identities of specific persons are within Defendants' knowledge, a relaxed

---

26   [9] The FSS schedule confirming the listing for Namenda XR Namzaric, and providing specific detail
27   concerning, *inter alia*, the vendor responsible for the listing (Allergan), the date, and the price, can be
     accessed and downloaded in Excel format at: https://www.va.gov/opal/nac/fss/pharmPrices.asp.

28                                              - 15 -

1  Rule 9(b) pleading standard is applied to the allegations in the Complaint. *Breville Pty Ltd. v.*

2  *Storebound LLC*, No. 12-CV-01783-JST, 2013 WL 1758742, at *5 (N.D. Cal. Apr. 24, 2013) (analyzing

3  inequitable conduct allegations, which are more stringent than what is required for FCA claims).

4  **VI.     Adamas's Public Disclosure Argument Lacks Merit**

5            Adamas repeats the same arguments raised by Allergan with respect to the public disclosure

6  bar. For the reasons set forth in Relator's opposition to Allergan's motion to dismiss, the Court should

7  reject those arguments as well. *See* Pl. Opp. to Allergan's MTD, Section V, at pp. 21-28).

8            Adamas, like Allergan, relies heavily on the patent prosecution dockets to argue that their false

9  submissions to the Patent Office were publicly disclosed under the FCA. But Defendants cannot rely

10  on their own fraudulent patent submissions to support an argument that public disclosure has occurred.

11  *Cf. U.S.* ex rel. *Spay v. CVS Caremark Corp.,* 913 F. Supp. 2d 125, 183 (E.D. Pa. 2012) ("To now

12  accept Defendants' theory would mean that by their very act of submitting their allegedly false claim

13  *via* the PDE reports, Defendants have effectively shielded themselves from FCA liability through the

14  public disclosure bar. This clearly cannot be the correct result.")

15            Adamas tries to add to Allergan's argument by saying that certain generic ANDA filers

16  asserted inequitable conduct as affirmative defenses in actions beginning July 2014 through 2016.

17  (MTD, at 5-7) This changes nothing, because those inequitable conduct allegations were pleaded in

18  connection with patent infringement actions, which are civil actions in which the government is not a

19  party. Congress specifically amended the FCA in 2010 to exclude such information from the public

20  disclosure bar. 31 U.S.C. § 3730(e)(4)(A)(i). Adamas, like Allergan, also tries to rely on *Amphastar*

21  *Pharms. Inc. v. Aventis Pharma SA*, 856 F.3d 696, 705 (9th Cir. 2017). But like Allergan, Adamas

22  completely misses that *Amphastar*'s public disclosure holding was superseded by Congress in 2010,

23  and that if anything, the district court's decision in *Amphastar* confirms the viability of Relator's

24  claims. *See generally* Pl. Opp. to Allergan's MTD, at pp. 18, 19 & 25); *see also Amphastar,* 2013 WL

25  12139832, at *3 and 2012 WL 5512466, at *9–13.

26            Nor can Adamas circumvent Congress's amendments by claiming that because the dockets in

27  the infringement actions were available on PACER, such information was disclosed as a "Federal

28                                                    - 16 -

1  report" or "news media" under §§ 3730(e)(4)(A)(ii), (iii). *See* Pl. Opp. to Allergan's MTD, Section

2  V(B), at pp. 23-28 (explaining that the specific provisions in §3730(e)(4)(A)(i) governs the more

3  general provisions in §§ 3730(e)(4)(A)(ii), (iii); that such an approach would be inconsistent with

4  controlling precedent; that such an approach is inconsistent with those terms' ordinary meaning; that

5  doing so would be contrary to the policies behind the public disclosure provision; and that the well-

6  reasoned decision in *Integra*, 2019 WL 3282619, at *11, rejects the notion that information available

7  in PACER can possibly support a public disclosure bar in light of the 2010 amendments to the FCA).

8      Adamas also tries to argue that the information in the patent infringement pleadings was

9  disclosed by Adamas in documents attached to Information Disclosure Statements submitted to the

10  Patent Office in connection with different, wholly irrelevant patent applications filed in April 2016.

11  (MTD, at 2 & 7; Portelli Decl., Exs. 5 & 6) But these disclosures do not fall within any enumerated

12  public forum in the FCA. *See* Pl. Opp. to Allergan's MTD, at Section V, pp. 23-28.

13      Adamas argues that the patent prosecution docket constitutes a federal report, citing a snippet

14  of a footnote of dictum from an out-of-circuit decision concluding that SEC filings constitute public

15  disclosures. (MTD, at 13, *citing U.S. ex rel. Ryan v. Endo Pharmaceuticals, Inc.*, 27 F. Supp. 3d 615

16  (E.D. Pa. 2014)) That decision is, to say the least, unpersuasive: The court stated that a 10–k filing

17  with the SEC qualifies as a federal report. This was a single sentence in a footnote, without any

18  analysis, after the court already found that those relators' complaints were barred by the first-to-file

19  rule. *Id.* at 628, & n.16. Moreover, the court's statement concerning SEC filings is at odds with

20  decisions that require a "Federal report" to have at least been an actual *report* prepared by a

21  government representative who gathered what the representative determined to be relevant information

22  responsive to a specific inquiry, such as a FOIA request in *Schindler Elevator Corp. v. United States*

23  *ex rel. Kirk*, 563 U.S. 401 (2011); or a request to CMS for certain Medicare data in *Integra*, 2019 WL

24  3282619, at *6. For the reasons set forth in Relator's brief in opposition to Allergan's motion to

25  dismiss, the Court should adhere to the ordinary meaning of "Federal report" in § 3730(e)(4)(A)(ii)

26  and reject Adamas's suggestion to extend *Ryan* to patent prosecution filings. *See* Pl. Opp. to

27  Allergan's MTD, at Section V(B); *cf. State ex rel. Bartlett v. Miller*, 243 Cal. App. 4th 1398, 1410,

28

- 17 -

1    197 Cal. Rptr. 3d 673, 681 (2016) (an SEC filing is neither a "report" nor "news media" under

2    California's similar false claims statute).

3            Allergan cannot not cite a single case—controlling or otherwise—holding that documents

4    available on the Patent Office's PAIR online docket triggered the public disclosure bar under the current

5    version of the statute. Similarly, Adamas cannot cite a single case that the PACER online docketing system

6    can trigger a public disclosure bar either. To the contrary, the only court that appears to have analyzed this

7    issue is *Integra,* and in a well-reasoned decision, the court rejected that argument. *Integra*, 2019 WL

8    3282619, at \*11-12 ("Under Defendants' view, the mere posting of the transcript on PACER or a tweet . . .

9    could render the information from the hearing publicly disclosed under the FCA, even though it otherwise

10   would not be. This would run contrary to the purposes underlying the public disclosure bar, and indeed the

11   FCA itself").

12           In any event, the April 2016 submissions do not actually disclose anything material about the

13   fraud alleged in the Complaint. Rather, they merely list the generic ANDA filers' pleadings—without

14   any description whatsoever—along with thousands of other references also missing any meaningful

15   descriptions. That is not the sort of specific disclosure of material allegations of fraud that the Ninth

16   Circuit has required to invoke the public disclosure bar. *See U.S.* ex rel. *Mateski v. Raytheon Co.*, 816

17   F.3d 565, 579 (9th Cir. 2016) (disclosed fraud was not substantially similar to the relator's claim

18   because "the prior reports could not have alerted the Government to the specific areas of fraud alleged

19   by" the relator).

20                                       **CONCLUSION**

21           For the foregoing reasons, the Motion to Dismiss should be denied in its entirety. In the

22   alternative, the Court should permit Relator to amend his pleadings should there be any deficiency.

23

24

25

26

27

28

RELATOR'S OPPOSITION TO ADAMAS DEFENDANTS'            CASE NO. 3:18-CV-03018-JCS
MOTION TO DISMISS

Respectfully submitted,

Dated: August 12, 2019

HERRERA PURDY LLP

By:    */s/ Nicomedes Sy Herrera*      
          Nicomedes Sy Herrera

Nicomedes Sy Herrera (State Bar No. 275332)
Laura E. Seidl (State Bar No. 269891)
HERRERA PURDY LLP
1300 Clay Street, Suite 600
Oakland, California 94612
Telephone: (510) 422-4700
Email: NHerrera@HerreraPurdy.com
       LSeidl@HerreraPurdy.com

Andrew Purdy (State Bar No. 261912)
Bret D. Hembd (State Bar No. 272826)
HERRERA PURDY LLP
4590 MacArthur Boulevard, Suite 500
Newport Beach, California 92660
Email: APurdy@HerreraPurdy.com
       BHembd@HerreraPurdy.com

Tejinder Singh (*Pro Hac Vice*)
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
Telephone: (202) 362-0636
Email: TSingh@GoldsteinRussell.com

Warren T. Burns (*Pro Hac Vice*)
Christopher J. Cormier
(*Pro Hac Vice* application to be submitted)
C. Jacob Gower (*Pro Hac Vice*)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Email: WBurns@BurnsCharest.com
       CCormier@BurnsCharest.com
       JGower@BurnsCharest.com

*Attorneys for Plaintiff-Relator Zachary Silbersher*

- 19 -