1-57

<pre>
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
 2                       SAN FRANCISCO DIVISION

 3

 4   ZACHARY SILBERSHER, et al.,  )  Case No.  18-cv-03018-JCS
                                  )
 5             Plaintiffs,        )  San Francisco, California
                                  )  Thursday, December 19, 2019
 6       vs.                      )  Courtroom G, 15th Floor
                                  )
 7   ALLERGAN INC., et al.,       )
                                  )
 8             Defendants.        )
     _____)
 9

10                   TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE JOSEPH C. SPERO
11               UNITED STATES CHIEF MAGISTRATE JUDGE

12

13   APPEARANCES:

14   For Plaintiffs:             LAURA E. SEIDL, ESQ.
                                 NICOMEDES SY HERRERA, ESQ.
15                               Herrera Purdy Weiler LLP
                                 1301 Clay Street, Suite 600
16                               Oakland, California 94612
                                 (510) 422-4700
17
                                 ANDREW M. PURDY, ESQ.
18                               BRET D. HEMBD, ESQ.
                                 SEAN KENNEDY, ESQ,
19                               Herrera Purdy Weiler LLP
                                 4590 MacArthur Boulevard, Suite 500
20                               Newport Beach, California 92660
                                 (949) 936-0900
21
                                 TEJINDER SINGH, ESQ.
22                               Goldstein and Russell, P.C.
                                 7475 Wisconsin Avenue, Suite 850
23                               Bethesda, Maryland 20814
                                 (202) 362-0636
24

25   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
</pre>

2

```
 1   APPEARANCES:  (Cont'd.)

 2   For Allergan Defendants:      M. SEAN ROYALL, ESQ.
                                   OLIVIA ADENDORFF, ESQ.
 3                                 Kirkland & Ellis, LLP
                                   1601 Elm Street
 4                                 Dallas, Texas 75201
                                   (214) 972-1770
 5
                                   JOHN D. W. PARTRIDGE, ESQ.
 6                                 Gibson, Dunn & Crutcher LLP
                                   1801 California Street, Suite 4200
 7                                 Denver, Colorado 80202-2642
                                   (303) 298-5700
 8
     For Adamas Defendants:        ANDREW J. HOFFMAN, II, ESQ.
 9                                 DLA Piper LLP (US)
                                   2000 Avenue of the Stars, Suite 400
10                                 North Tower
                                   Los Angeles, California 90067-4704
11                                 (310) 595-3000

12                                 MATTHEW A. HOLIAN, ESQ.
                                   DLA Piper LLP (US)
13                                 33 Arch Street, 26th Floor
                                   Boston, Massachusetts 02110
14                                 (617) 406-6009

15   Transcription Service:        Peggy Schuerger
                                   Ad Hoc Reporting
16                                 2220 Otay Lakes Road, Suite 502-85
                                   Chula Vista, California 91915
17                                 (619) 236-9325

18

19

20

21

22

23

24

25
```

1    SAN FRANCISCO, CA  THURSDAY, DECEMBER 19, 2018  2:33 P.M.

2                              --oOo--

3          THE CLERK:  We are calling Case Number 18-cv-3018,

4    Silbersher v. Allergan PLC.

5          THE COURT:  Appearances, please.

6          MS. SEIDL:  Good morning, Your Honor.  Laura Seidl for

7    the Plaintiffs.

8          THE COURT:  No -- up here.  Good afternoon.

9          MS. SEIDL:  I beg your pardon.  Laura Seidl for the

10   Plaintiff Relator who is here with us today.

11         THE COURT:  Welcome.

12         MR. SILBERSHER:  Good afternoon.

13         THE COURT:  Welcome.

14         MS. SEIDL:  Thank you.

15         MR. HERRERA:  Good morning, Your Honor.  Nicomedes

16   Herrera, Herrera Purdy, for the Plaintiff Relator.

17         THE COURT:  Thank you.

18         MR. SINGH:  Your Honor, Tejinder Singh from Goldstein

19   and Russell also for the Plaintiff Relator.

20         THE COURT:  Welcome.

21         MR. HEMBD:  Good afternoon, Your Honor.  Bret Hembd from

22   Herrera Purdy for the Plaintiff Relator.

23         THE COURT:  Okay.

24         MR. PURDY:  Good afternoon, Your Honor.  Andrew Purdy on

25   behalf of the Relator Plaintiff.

1          MR. KENNEDY:  Good afternoon, Your Honor.  Sean Kennedy

2    of Herrera Purdy on behalf of Plaintiff Relator.

3          THE COURT:  Welcome.

4          MR. ROYALL:  Good afternoon, Your Honor.  Sean Royall

5    with Kirkland & Ellis for the Allergan Defendants.

6          MS.  ADENDORFF:   Olivia Adendorff  for  the  Allergan

7    Defendants.

8          MR.  PARTRIDGE:   Good  afternoon,  Your  Honor.   John

9    Partridge  of  Gibson,  Dunn  &  Crutcher  here  on  behalf  of  the

10   Allergan Defendants.

11         MR.  HOFFMAN:   Good  afternoon,  Your  Honor.   Andrew

12   Hoffman from DLA Piper on behalf of the Adamas Defendants.

13         MR. HOLIAN:  Good afternoon, Your Honor.  Matt Holian

14   from DLA Piper on behalf of the Adamas Defendants.

15         THE COURT:  Welcome.

16         MR. HOLIAN:  How are you?

17         THE COURT:  I'm good.  All right.  So I want to -- I

18   want to talk today -- you're welcome to talk about whatever you

19   want to talk about.  I want to talk about the public disclosure

20   bar issues.

21        But the first question I have is about Forest Labs whatever.

22   And  I  don't  know  whether  this  is  --  which  of  the  Defendants'

23   lawyers is going to address this, but if the Defendant is Forest

24   Laboratories Holdings, Ltd., all of the references in the text of

25   the motions are to generally Forest Labs, Inc., so I need a little

1  bit of back- -- what is the -- who is the Defendant and who is

2  Forest Labs, Inc. and how are they related and what's up with

3  that?

4      Well, one of you has Forest Labs, Inc., so that's the person

5  who should talk.

6          MR. PARTRIDGE:  Sure, Your Honor.

7          THE COURT:  No.  We do argument from the podium, please,

8  because we're recording.

9          MR. PARTRIDGE:  Yes, Your Honor.  John Partridge, here

10  about the Allergan Defendants.  The Allergan Defendants include

11  the Forest Lab entities as a result of an acquisition.

12          THE COURT:  Well, stop.  Stop for a second.  Which -- so

13  there's a Defendant, Forest Lab something Ltd.  Right? -- it's

14  Forest Laboratories Holdings, Ltd.  That's a subsidiary of whom?

15          MR. PARTRIDGE:  It's a -- Your Honor, I think what would

16  probably be best for our purposes today is for me to come back

17  with further information about this in terms of the particulars of

18  the corporate structure.  The Allergan group entity is Allergan

19  PLC.

20          THE COURT:  Right.

21          MR. PARTRIDGE:  That was the entity that was dismissed

22  voluntarily by agreement with the Relators --

23          THE COURT:  Right.

24          MR. PARTRIDGE:  -- in Your Honor's order.  That entity

25  is the over-arching umbrella entity with Forest Lab entities

1    thereunder.

2              THE COURT:  Right.

3              MR. PARTRIDGE:  In terms of the particulars of Ltd.

4    versus --

5              THE COURT:  So -- so are there any -- what Allergan

6    entities are still in the case?

7              MR. PARTRIDGE:  The Allergan entities that are still in

8    the case are -- now I'm trying to recall specifically -- Allergan

9    Sales, --

10             THE COURT:  Allergan, Inc.?

11             MR. PARTRIDGE:  Allergan, Inc., and then the Forest

12   Laboratories entity.

13             THE COURT:  And the Forest Laboratory entity, what's the

14   relationship between that entity and the Forest Laboratories that

15   would have anything to do with these patents?

16             MR. PARTRIDGE:  Your Honor, I think this is something

17   where I don't know standing here and I would need to report back

18   to you with further information.

19             THE COURT:  You may know.  Funny that I'm looking to

20   them to tell me, but go ahead.

21             MR. HERRERA:  Your Honor, I believe that Forest Labs,

22   Inc. --

23             THE COURT:  So say your name before you speak so that

24   the recording will get it, please.

25             MR. HERRERA:  Thank you, Your Honor.  Nicomedes Herrera.

1          THE COURT:  Yes.

2          MR. HERRERA:  I believe that Forest Labs., Inc. became

3   Forest Labs, LLC --

4          THE COURT:  Yes.

5          MR. HERRERA:  -- and that was -- that merged with

6   various Allergan entities that became Allergan Sales, LLC, --

7          THE COURT:  Yes.

8          MR. HERRERA:  -- which is a subsidiary of Allergan, Inc.

9   And I believe as part of the stipulation in which we dismissed

10  Allergan PLC, --

11         THE COURT:  Yes.

12         MR. HERRERA:  -- the Defendants had stipulated -- and of

13  course my colleague can confirm this --

14         THE COURT:  Right.

15         MR. HERRERA:  -- they admitted that Allergan Sales, LLC

16  is the successor-in-interest to Forest Laboratories, Inc.

17     Is that correct?

18         THE COURT:  We could find that out.  It's probably in

19  the record.

20         MR. PARTRIDGE:  Yeah.  I think that that's probably the

21  best way to approach that, Your Honor.

22         THE COURT:  All right.  The reason I'm asking these

23  questions is if hypothetically I get to the non-public disclosure

24  bar issues in the case, who did what matters.  And so that's the

25  -- so --

1      (Pause.)

2      It says here that Allergan, LLC is the successor-in-interest

3  to the liabilities of Forest Laboratories, Inc. and/or Forest

4  Laboratories, LLC together with Forest.  And Forest Laboratories,

5  Inc. is the entity that had some participation during the relevant

6  periods of time as a licensee of the patents or something like

7  that; is that right?

8           MR. HERRERA:  Yes, sir.

9           THE COURT:  Okay.  So you all agree to that; right?

10  Counsel?

11           MR. PARTRIDGE:  With respect to the Forest Laboratories,

12  LLC entity and its involvement in licensing of the '009 patent in

13  particular?

14           THE COURT:  Well, Forest Laboratories, Inc. is the only

15  entity that's actually discussed in any of your briefing as doing

16  anything.

17           MR. PARTRIDGE:  That's correct.

18           THE COURT:  And you agree that Forest Laboratories, Inc.

19  -- the successor to Forest Laboratories, Inc. is one of the

20  Allergan Defendants; right?

21           MR. PARTRIDGE:  Yes, sir.

22           THE COURT:  Specifically, Allergan Sales, LLC; right?

23           MR. PARTRIDGE:  Yes, Your Honor.

24           THE COURT:  Okay.  So as confusing as that is, let's

25  move on.

So I want to talk to you about the issues regarding the public disclosure questions.  I'm -- you know, it's -- I guess -- it's an interesting case, and it seems to me that there doesn't seem to be any dispute that all of the material facts regarding the fraud are disclosed in publicly-available materials on the PAIR website in those -- in the patent prosecution files.  That's right, is it not?

UNIDENTIFIED SPEAKER:  (Inaudible).

THE COURT:  As I said several times to several of your colleagues, we're going to argue from the podium because we're recording this.  So, actually, why doesn't everybody -- anyone who wants to argue, come up to the podium.  Okay?  Let's just come to the podium and stand.  We'll do that.  That will solve this problem.

So you think there are material facts regarding the fraud; that is to say, the fraud on PTO, which are not in the patent prosecution history?

MR. SINGH:  No, Your Honor.  We think -- we would concede that the relevant information from which the inference of fraud could be drawn is in the --

THE COURT:  Okay.  Well, that was my only question.  And so the -- the questions that arises are whether that source is a report within the meaning of the statute and whether or not, if it is a report, the Relator is an original source anyway.

MR. SINGH:  That's correct, Your Honor.

1    THE COURT:  Am I right on the train of thought?

2    MR. HOFFMAN:  I think you've already got it correct,

3  Your Honor.  This is Andrew Hoffman on behalf of the Adamas

4  Defendants.  A reference was made to the PAIR database and whether

5  the available material facts were there from which someone could

6  make an inference of fraud.  We certainly agree that all of the

7  material facts are on the PAIR database and that qualifies as a

8  federal report under the public disclosure bar.

9    But as to the Adamas Defendants, actually explicit- --

10  there's no need for an inference.  Every explicit allegation of

11  fraud that appears in Mr. Silbersher's amended complaint is copied

12  and pasted --

13    THE COURT:  Well, it doesn't matter whether it's an

14  inference.  For purposes of this statute, it doesn't matter

15  whether it's an inference or not.

16    MR. HOFFMAN:  I think --

17    THE COURT:  If you can draw an inference from facts in

18  a public disclosure, then the case goes away unless there's an

19  original source.  It doesn't matter whether it has to be inference

20  or whether it's specially set there or whether or not they've laid

21  it out in a complaint because they have the counterclaims by

22  Amneal and Amerigen; right?  It doesn't matter.  So I'm going to

23  focus on actually what matters.

24    MR. HOFFMAN:  Absolutely you're correct that the

25  inference is broad.  The material facts are not the trigger.

1          THE COURT:  There you go.  Okay.  So then the question

2     is:  You know, is -- there's -- is -- because if that's the case,

3     we get past the substantially similar transaction step and we move

4     on to whether it's a federal report, and that is I think the

5     question I want you to talk the most about.  It is the toughest of

6     the questions since no one's decided it.

7          You know, there is the *Schindler* case.  Obviously, we start

8     with that.  It is not quite on all fours.  It is a case where --

9     I'm sorry -- where there actually was a -- a person who went

10    through documents and had to do -- figured out what the documents

11    were and had them produced in the course of a FOIA exam that -- it

12    doesn't talk a lot about it, but they had to figure out whether

13    they were disclosable under the exemptions in FOIA, etc., etc.

14         This is not quite that case.  And that case came from a

15    federal employee.  I guess the Court rejected the idea it had to

16    be some agency.  It could be a federal employee.  This is not

17    quite that because this is a -- a database that's maintained by

18    the PTO, but it's self-accessed.

19         A person can go on it, go to the public site and type in some

20    words and search it and find what they want to find.  It's -- and

21    the question is whether or not it's -- that is a distinction which

22    is meaningful.

23         The cases that are closest to giving us some hint as to when

24    it's -- whether it's meaningful are the SEC cases where courts

25    have held pretty uniformly that SEC filings are reports within the

1   meaning of this act, even though they're filed by -- not by a

2   government.  They're made available to the public, fulfillment of

3   the  statutory  obligation  by  the  Securities  and  Exchange

4   Commission, which doesn't make every filing available but, as

5   guidance in this statute about what it's supposed to -- must make

6   public, those cases seem to pretty uniformly hold that those are

7   reports within the meaning of the statute.

8        Why should this be any different?

9            MR. SINGH:  So, Your Honor, again I'm Tejinder Singh for

10  the Plaintiffs.

11           THE COURT:  Yes, Mr. Singh.

12           MR. SINGH:  I'd like to take you just a step back to the

13  text of the statute and to talk about the *Schindler Elevator* case.

14           THE COURT:  Uh-huh.

15           MR. SINGH:  Because it is important to understand that

16  the *Schindler* case decided in 2011 was construing the prior

17  version of the public disclosure bar.

18           THE COURT:  Yes.

19           MR. SINGH:  And in 2010, Congress made significant

20  amendments to it.  And it would actually be helpful if you have in

21  front of you the text of the statute.  The --

22           THE COURT:  I do.

23           MR. SINGH:  The new provision -- I'll start with

24  subsection (i) says, The public disclosure exists if the

25  disclosure  occurred  "in  a  federal  criminal,  civil,  or

1  administrative hearing in which the Government or its agent is a

2  party."

3           THE COURT:  Well, that's not this.

4           MR. SINGH:  That's correct.

5           THE COURT:  And the only change there is "in which the

6  Government or its agent is a party."

7           MR. SINGH:  That is the -- there are two changes.  One

8  is it has to be federal and the Government has to be a party.  In

9  the prior version of the statute, it said if there was a public

10 disclosure in a criminal, civil, or administrative hearing.

11 Period.

12     And so the two changes Congress made are significant, and I

13 just want to piece through how they interact with *Schindler*

14 *Elevator*.

15          THE COURT:  Well, but none -- none of those changes have

16 to do with reports.

17          MR. SINGH:  I think they do, Your Honor.  So the way we

18 would explain this is the best analogy, the way to understand

19 this, is to think about the PACER system.  The PACER system is a

20 website maintained by the Government on which the Government -- or

21 on which the public can access information about what's going on

22 in courts under the very broad understanding of what is a federal

23 report that the other side is pressing, that which gives

24 information that's done by the Government --

25          THE COURT:  Well, that which gives information done by

1  the Government.    That which gives information done by the

2  Government under a duty by statute to make public, etc., etc.

3       So it's not just.

4            MR. SINGH:  So -- okay.  I want to be clear about it.

5            THE COURT:  But so what?  You're not making sense.  You

6  said that something in these changes to a different subsection of

7  this statute makes reports narrower than I'm thinking about.

8       What is it about the change that --

9            MR. SINGH:  That's correct, Your Honor.  So here's how

10 I would put it.  And *Schindler Elevator* supports this inference.

11 If you recall in *Schindler Elevator*, the Supreme Court was quite

12 emphatic that when you construe what a report meant, you should

13 look at all the sections.

14      And it said -- when I see the words "news media," I think of

15 breadth?  Right?  "News media" seems broad, so we're going to

16 construe reports broadly.  That was part of the reasoning of

17 *Schindler*.

18      However, --

19            THE COURT:  So that's "news media."

20            MR. SINGH:  No.  That's correct.  However, we should

21 also look at the changes to subsection (i) because -- so I'll just

22 say if it is true -- so take as this premise that if a report

23 could encompass PACER, that would have to be wrong because it

24 would swallow exactly what Congress was trying to accomplish in

25 changing subsection (i).

1    I think the same holds true for PAIR.  PAIR, Your Honor, is
2  effectively the docket sheet for the administrative hearing in
3  which the Government is not a party.  So if the reproduction of a
4  civil litigation --
5            THE COURT:  Well, I'm not sure that's right -- the
6  Government is not a party?  I mean, I have to think about that.
7  I think you're probably wrong.  The Government is a party.  PTO --
8  it is -- it is a -- they file something.  I appreciate this.
9    So why are SEC cases -- why is this distinguishable from the
10  SEC cases?
11            MR. SINGH:  I'd be happy to talk about it.  It flows
12  from this argument that I'm making now, though.  So just to be
13  clear, the essential premise of our strongest argument is that
14  PAIR is to patent prosecution what PACER is to civil litigation.
15  And if civil litigation in which the Government is not a party
16  can't be swept in as federal reports because PACER exists --
17            THE COURT:  No.  Maybe it can.
18            MR. SINGH:  I don't think so, Your Honor.
19            THE COURT:  No one's ever held that it doesn't.
20            MR. SINGH:  The other side has quite emphatically
21  disclaimed that possibility.  Because if it were so, Your Honor,
22  just think about this.  Look again at romanette (i) -- "A federal
23  criminal, civil, or administrative hearing in which the Government
24  or agent is a party."
25    The language in which the Government or agent is a party

1 would effectively be read out of the statute if every docket sheet

2 for every federal and criminal case or administrative hearing was

3 itself a federal report.  There would be no point to adding that

4 exclusion.

5   And Congress did so quite deliberately.

6    THE COURT:  Well, it's different because it's -- it

7 would be more limited.  You're probably wrong about criminal and

8 I'm sure you're wrong about administrative hearings, but you're

9 probably right about civil cases.

10    MR. SINGH:  Right.  So --

11    THE COURT:  Because PACER is just civil.

12    MR. SINGH:  -- it includes all civil litigation, Your

13 Honor, at a minimum, at a minimum.  And certainly a lot of

14 criminal cases are on PACER.  Certainly a lot of administrative

15 hearings have their own docket sheets.

16   And here's the essential feature of the docket sheets --

17    THE COURT:  It's not about the docket sheets; right?

18 It's about the documents.

19    MR. SINGH:  I -- but the documents are available through

20 the docket sheets --

21    THE COURT:  Some are.

22    MR. SINGH:  -- as on PACER.

23    THE COURT:  Well, not always.  In many criminal cases,

24 they're not.

25    MR. SINGH:  Well, let me put it this way, Your Honor:

1    The other side is not arguing -- and I think they could not argue

2    -- that, for example, the Amneal answer that Adamas put so much

3    weight on is itself a federal report because you can get it off

4    PACER.

5              THE COURT:  Right.

6              MR. SINGH:  In fact, they have disclaimed that argument

7    in their reply brief.  Now -- and I think PAIR works the same way

8    for the PTO.  It really just shows you the docket sheet of the

9    prosecution.

10       And here's the important point, Your Honor.

11             THE COURT:  Well, so why is that different?  PACER is

12   actually a record of federal civil hearings, lawsuits.  It's -- it

13   is -- PAIR is not.

14             MR. SINGH:  It's not a record of a lawsuit, but it is a

15   hearing, Your Honor.

16             THE COURT:  There's no hearing.

17             MR. SINGH:  I think the -- in *A-1 Ambulance*, the Ninth

18   Circuit said, "Hearings in this context really means any kind of

19   proceeding, not just a hearing as we would understand it."

20       It's plainly an administrative proceeding that's conducted.

21   And to your point -- you asked about whether the Government is a

22   party -- I just want to be clear about one thing.

23             THE COURT:  Yes.

24             MR. SINGH:  The Defendants have not argued otherwise.

25   They surely could have, but they have not made that argument.

1    THE COURT:  No, but why isn't it true?

2    MR. SINGH:  Because the Government is acting, Your

3  Honor, in the stance of an adjudicator.  In the same way that you

4  are not a party to this litigation, even if, Your Honor -- even if

5  we had, for example, an ex parte proceeding where I came before

6  you and I --

7    THE COURT:  Well, describe for me a federal

8  administrative hearing in which the United States is a party.

9    MR. SINGH:  The SEC could bring enforcement proceedings

10  in an administrative context.  The FTC can bring enforcement

11  proceedings in an administrative posture.  There are lots of

12  scenarios in which the Government is indeed a party to

13  administrative proceedings.

14    THE COURT:  Uh-huh.

15    MR. SINGH:  It happens all the time that they adopt an

16  adversarial posture and they effectively, you know, litigate in

17  the administrative forum.  But this is not one of those.  The

18  Government is effectively an adjudicator.

19    And I would say, Your Honor, as I was saying, just as you are

20  not any of our counterparties, even if I appeared before you in an

21  ex parte posture and asked for a temporary restraining order, no

22  one would say that because you are the person probing my arguments

23  that you become the party.

24    THE COURT:  No, no.

25    MR. SINGH:  And that's exactly what a patent prosecution

1  is like.  The applicant shows up and says, "I'm applying for this"

2  in the same way you might apply for a license or something else.

3  And the Government is being an adjudicator in the same way you

4  might get a Government contract or a Government benefit.  The

5  Government is not a counterparty in those situations.

6          THE COURT:  Uh-huh.

7          MR. SINGH:  And it's not in the -- for PAIR.  And I just

8  want to be clear that all that PAIR is, as you described it quite

9  correctly, Your Honor, a recitation of what went down during

10  patent prosecution.  That's what it shows you.  When you go to the

11  website, you will input the name of the patent application or the

12  patent you want to know about and then it will show you the image

13  file wrapper.  An "image file wrapper" is a synonym for "docket

14  sheet."  It is just chronologically arranged every document that

15  was filed during patent prosecution.  And then some of those

16  documents you can click on a hyperlink and pull an image and look

17  at them; right?  It is indistinguishable functionally from PACER

18  except it's a lot harder to use.

19          THE COURT:  Well, but it is functionally the same from

20  all relevant points of view as FOIA.  Here's my argument about

21  that.  Can't the United States decide that it wants to meet its

22  statutory obligation by making disclosures to the public and

23  having an electronic system for the public to access those

24  disclosures?

25          So, for example, you could have -- you know, the FOIA request

1   to X agency.  X agency could put all of its documents online in an

2   effort to comply with FOIA, allow people to come online, make a

3   search for the ones that are required and made public, and then

4   they get them.

5        Why does it matter that it's this electronic version as

6   opposed to the mechanical version that was at issue in *Schindler*

7   *Elevator*?

8             MR. SINGH:  So I see -- I see you're characterizing this

9   as essentially wholesale FOIA; right? -- as opposed to responding

10  to an individual request with a written response.  They make a

11  website that puts everything out.

12            THE COURT:  I don't know that it's wholesale.  It's the

13  Government -- how the Government decides to get ahead of it and

14  get ready for satisfying its obligations.

15            MR. SINGH:  I do not think, Your Honor, that if the

16  Government, for example, transmitted the message in *Schindler*

17  electronically as opposed to on paper, it would have changed the

18  result.

19       However, I do think that when you talk about whether

20  something is a federal report, it is -- it is critical to pay

21  attention to what Congress was doing in 2010.  So if we are right

22  -- and we are -- that in 2010, one of the principal objectives

23  Congress had was to facilitate more False Claims Act suits by

24  stripping out civil, criminal, and administrative proceedings in

25  which the Government is not a party, it would be utterly contrary

1  to that intent to construe a different provision of the public

2  disclosure bar to pull that in.

3      Now, to be clear, that point can be taken too far, and I want

4  to illustrate why I think we're on the right side of any line.  If

5  the New York Times showed up to the Amneal case and wrote an

6  article about the contents of the answer, we -- they would be

7  right that, you know, that's publicly disclosed in the news media.

8           THE COURT:  Well, it's the news media.

9           MR. SINGH:  However, in this situation all you have is

10 you have the PAIR docket, which I will say is part and parcel of

11 the hearing itself, in the same way that the docket sheet for

12 civil litigation is part and parcel.  It is a docket that has no

13 independent significance; right?  That is, the Government is not

14 producing a report pursuant to some other thing.

15          THE COURT:  Well, no.  That's not entirely correct.

16 Because I know about those dockets, as you do.  They pick -- they

17 screen for what will be publicly disclosed.  So it's not

18 everything that comes in.  It's not everything.  So -- and -- so

19 that's my worry about this, is that it actually is a mechanism

20 whereby the Government has chosen A, not B.  You know, there's a

21 private docket.  There's a confidential docket.  There's a public

22 docket.  There's a number of things.

23          MR. SINGH:  That's true, but that would also be true, I

24 think, of PACER; right? -- where certain materials are filed under

25 seal or similar -- there's an amount of selectivity that goes into

1   what gets disclosed on the public docket sheets.  That's quite

2   common practice in all these scenarios.  And I don't think it

3   would make much legal difference.

4       I think the question that you should ask, Your Honor, is:  As

5   I look at PAIR, is what I'm looking at simply part and parcel of

6   the administrative hearing that is excluded from the scope of the

7   public disclosure bar, or is it something independent from it?

8       And this gets to my answer to your question about SEC

9   reports.

10          THE COURT:  Independent from it.  Why do you think it

11  has to be independent?  Where -- what case are you drawing on that

12  it has to be independent from it?

13          MR. SINGH:  Because, Your Honor, if it weren't, then it

14  would get to the problem that I identified earlier of being

15  contrary to Congress's intent to take those proceedings out of the

16  game.

17          THE COURT:  Well --

18          MR. SINGH:  Right?  If it would not be the case, right,

19  there is just no way to look at it and say the proceeding, the

20  administrative proceeding, is not a public disclosure, but all of

21  the documents in the administrative proceeding are public

22  disclosures because, as part of the proceeding, the PTO creates

23  this.

24      And so you should ask if it's independent.

25          THE COURT:  Well, although --

1          MR. SINGH:  And then the SEC --

2          THE  COURT:   Although -- although Congress wasn't

3    thinking about those things.  They weren't thinking about that

4    distinction that you're drawing now.  There's no evidence that

5    they had that in mind.  So it may be that there are other parts

6    of, as you say, the news media which may sweep away pieces of the

7    first section because -- because the report is supposed to be so

8    broadly --

9          MR. SINGH:  But those things are done independent of the

10   proceeding itself.  There's nothing inherent to patent prosecution

11   that causes the New York Times to report on it.  There is nothing

12   inherent to civil litigation that causes the New York Times --

13         THE COURT:  Well, no, but I'm not --

14         MR. SINGH:  -- to report on it.

15         THE COURT:  I'm not talking about the news media.  I'm

16   talking about in general Congress was not doing what you are

17   doing.  They didn't say, On the other hand, if it falls within

18   reports, we're not including it if it's just part and parcel of

19   the  administrative  proceeding.   It's  got  to  be  something

20   independent of the administrative proceeding.

21      That's something you've brought up, but Congress didn't think

22   of that.  That's a distinction you've brought up.

23         MR. SINGH:  Your Honor, it's quite well-settled I think

24   that when we do statutory interpretation, we do so in an attempt

25   to harmonize various parts of a statute to give each portion --

1        THE COURT:   Of course.   This is how you're trying to
2   harmonize that.

3        MR. SINGH:   And those are the background assumptions
4   against which Congress legislates.   And I think that when Congress
5   does something so deliberate as narrowing the scope of the
6   hearings that are going to be included, it would not be correct to
7   read the statute to undo that in a different section.

8        THE COURT:   Okay.

9        MR. SINGH:   And I think that's just a critically
10  important point, and this does -- I do want to make sure I answer
11  your question about SEC reports.

12        THE COURT:   I hope so.

13        MR. SINGH:   Because those reports are not part of some
14  administrative proceeding or hearing.   Those reports are an
15  independent "reporting obligation" and they are put out pursuant
16  to that obligation, which is quite distinct, Your Honor, from
17  what's going on in the context of PAIR or PACER.   We can -- you
18  can distinguish those cases.

19      Now, I will also say that although you characterized those
20  cases as holding somewhat uniformly in that result, there's not a
21  lot of analysis in most of those cases.   It's not clear how
22  thoroughly these issues were ventilated and most of them arose
23  under the prior version of the statute.   And so when Congress has
24  subsequently narrowed it, there is a real question about whether
25  those cases would still be decided the same way today.

1      But what I'm saying to you is even if they would be, I do

2   believe that they are quite distinguishable.  And also as more --

3   as case --

4           THE COURT:  I bet with this U.S. Supreme Court, they

5   could decide this.

6           MR. SINGH:  As more case support for what I'm telling

7   you, we cited in our briefs to the *Integra Medical* decision.

8           THE COURT:  Uh-huh.

9           MR. SINGH:  And that was -- that made the exact argument

10   that I'm making about PACER.

11           THE COURT:  Yes.

12           MR. SINGH:  It made it in the context of construing the

13   term "news media" to not mean every website, including PACER.  But

14   of course the logic applies with equal force to federal reports

15   because Congress would not give with one hand and take away with

16   the other in this context.

17      And I think that the animating purpose of the 2010 amendments

18   was narrow the public disclosure bar so that more meritorious

19   suits can be brought.  And it's important to realize --

20           THE COURT:  And of course -- but the argument on the

21   other  side,  apart  from  disagreeing  with  your  statutory

22   construction  from  the  beginning  is,  well,  they  just  --  they

23   changed romanette (i).  They didn't change romanette (ii).  And so

24   if they wanted to change romanette (ii), they could have changed

25   romanette (ii), but they didn't.

1          MR. SINGH:  Well, they did change it.  They changed it
2    from saying -- it's a difference that may not matter to this
3    precise question.  But they added the word "federal."  So they
4    said "or other federal report."  And I think that what you could
5    say --

6          THE COURT:  Yes.

7          MR. SINGH:  -- is based on that, the -- and this goes
8    again to the SEC questions -- that what you need to be looking at
9    is not necessarily reports to the Federal Government, but reports
10   by the Federal Government, such that simply regurgitating
11   automatically information given by a private party may not qualify
12   as a federal report after the 2010 amendments.

13      Now, I know these propositions are all debated.  I don't
14   think that any of these arguments is so plainly obvious that the
15   opposition is frivolous.

16          THE COURT:  Right.

17          MR. SINGH:  On the other hand, I do think we have by far
18   the better reading of the statute here because there is no good
19   way to draw a bright line between PAIR and PACER.  And I think if
20   you look at their briefs in this case, they have run away as fast
21   as they can from the idea that their rule would sweep in PACER.
22   But for the life of me, I cannot figure out how they would avoid
23   that result.

24          THE COURT:  Well, we'll ask them now.

25          MR. HOFFMAN:  We never talked about PACER.  We don't

1   argue that PACER's a federal report.

2           THE COURT:  He says you are essentially arguing that

3   PACER is a federal report.  Even though you don't say that, with

4   respect to an administrative hearing that has its own PACER, a

5   federal administrative proceeding which the United States is not

6   a party, it's the exact same thing.

7           MR. HOFFMAN:  PACER sweeps in so much more information

8   than just information about proceedings where the United States is

9   a party.  The patent PAIR website is limited exclusively to

10  information that was disclosed to the United States Government.

11  They were aware of -- all of this information was available to the

12  United States and by -- by federal regulation, 37 CFR 1.11(d),

13  patent prosecution histories are matters of public record.

14          THE COURT:  What's that got to do with anything?  You're

15  not answering my question.  He's saying -- you're not actually

16  addressing the question.  PACER is with respect to lots of things

17  that the Government is not a party, a report that the United

18  States puts up, the Federal Government puts it up.  There's a

19  federal statute that makes the courts put it up.  There are rules

20  about what gets put up.  The reports are all in there.

21      Why isn't that the same as this?

22          MR. HOFFMAN:  It's different because PACER -- PACER is

23  not coextensive with what's going on in terms of proceedings

24  involving the United States Government.

25          THE COURT:  Of course not.

1          MR. HOFFMAN:  But PAIR --

2          THE COURT:  Of course not, but --

3          MR. HOFFMAN:  -- is, so we know the Government --

4          THE COURT:  No.  No.  You're not taking the position
5   that the Federal Government is a party to a proceeding before the
6   PTO, are you?

7          MR. HOFFMAN:  That's not -- that's not our position
8   here.  We are relying on the federal report prong of the public
9   disclosure bar which is --

10          THE COURT:  Okay.  So they're -- if they're not -- well,
11   I know, but if they're not party, so it's not just proceedings
12   against the United States.  That's not what it is.  So you're
13   still not -- you're still not getting it.  You're still not
14   getting it.  What is this difference from -- how is this different
15   from PACER?  PACER is just like the PTO's website.  You've got --
16   one's an administrative proceeding.  One's in court.  Okay?

17      And one is -- there's a statutory obligation to make it all
18   public and they do it through the PACER website.  There's a
19   statutory obligation to the PTO with respect to the documents that
20   are actually filed in the public domain on PAIR to do that as
21   well.

22      So far, we're exactly the same.  But you're not arguing that
23   -- but -- those seem to be identical.

24          MR. HOFFMAN:  Well, it's possible -- it's possible that
25   PACER is a federal report.  We haven't been advancing that

1  argument.

2          THE COURT:  No, no.  So if you try to advance that

3  argument, then he's going to attack you because it will be -- the

4  arguments you have to address here is why isn't your argument

5  directly contradictory of romanette (i)?  That's his argument.

6          MR. HOFFMAN:  Yeah.  But we're not invoking on the --

7  we're invoking romanette (ii).

8          THE COURT:  No, I understand that, but his argument is

9  -- I guess that is an argument.  I'm not sure how good an argument

10  it is.  But Congress came out and said, This is too broad.  We

11  don't want disclosures.  We used to have disclosures in things

12  where the Federal Government was not a party.  Right?

13  Administrative proceedings like this -- this is an administrative

14  proceeding.  We used to.  We're not going to have that anymore if

15  it's -- unless the United States or its agent is a party.

16      Why doesn't your construction of "report" contradict that?

17          MR. HOFFMAN:  The question there is -- I think it's

18  perfectly reasonable for Congress to decide that for the purposes

19  of roman (i), where you say, We want to limit the types of

20  proceedings that will trigger the public disclosure bar, it's

21  based on where can we be reasonably confident that the Government

22  would actually -- might come across this information.  Right?  And

23  so they made changes to that part of the statute.

24      We don't have to worry about whether or not the information

25  on public PAIR might sneak by the Government, especially not with

1    respect to the Adamas Defendants here.

2            THE COURT:  Okay.  But this isn't about that -- there's

3    lots of case law that says that's an irrelevant consideration in

4    deciding this question.  But it also doesn't make any sense to me.

5        What is left of the romanette (i) civil if you're right about

6    romanette (ii)?

7            MR. HOFFMAN:  What's left of romanette (i) is that it's

8    still any of the proceedings that occur where the United States is

9    not a party.

10           THE COURT:  It's not because your argument goes right to

11   PACER.  Your argument says PACER is a report where there's an

12   obligation to produce it and it's a Federal Government --

13           MR. HOFFMAN:  Did you say "Siri"?

14           THE COURT:  I didn't -- I did not say "Siri."  I did not

15   say "Siri."  Report -- if we find a report, we would have the

16   answer.

17       No, but my point is this:  Congress limited in romanette (i)

18   that the records which one could consult and still -- and not use

19   them in a *qui tam* action, or included cases in which -- civil

20   cases in which the Government is a party.  Okay?  That's romanette

21   (i).

22       Okay.  Your construction of romanette (ii) takes that away

23   because if every report on PACER -- every report on PACER is

24   included, then even though you've excluded them under these cases

25   under (i), you get them back in under (ii).

1          MR. HOFFMAN:   I think it's entirely, Your Honor, a

2    question of notice to the Executive Branch.  And there's no notice

3    to the Executive Branch of reports on PACER for cases that don't

4    involve the United States as a party.  With the PAIR database, we

5    -- we can rest assured that it was submitted to the U.S. Patent

6    and Trademark Office.

7          THE COURT:   So that's really clever and very exciting

8    and doesn't interpret the statute.  So I'm asking you a very

9    direct question.  So what you're saying is, "Yes, Judge.  You're

10   right.  Congress eliminated the word 'civil' from romanette (i)."

11         MR. HOFFMAN:   Congress -- with romanette -- I don't know

12   what Congress did to romanette (i), but I don't think --

13         THE COURT:   When they said civil -- limiting civil to

14   cases in which the United States or its agents is a party as those

15   which are a public document, by including PACER in (ii), then that

16   means if you can find it anywhere on PACER, whether or not the

17   United States is a party, it's a litigation, whether or not the

18   United States is a party, it is a forbidden source for a *qui tam*

19   action.

20         MR. HOFFMAN:   We would say that amendments to roman (i)

21   didn't change roman (ii).  Congress did make change to roman (ii)

22   as opposing counsel acknowledged.  They knew they could -- they

23   could have amended the statute in a way that they would prefer,

24   but it's not that way.  We've got binding guidance from the United

25   States Supreme Court in *Schindler Elevator* that says you read that

1    report prong extremely broadly to mean anything that gives
2    information or any formal or official statement of facts in
3    proceedings involving a federal agency.  I don't know how we get
4    around *Schindler*.  Every single case decided in the aftermath of
5    *Schindler* in the intervening decade, every court has held that
6    formal written submissions to federal agencies, such as the SEC or
7    the FDA, those formal written submissions are federal reports
8    under Part 2 of the public disclosure law.

9        It -- the case law is unanimous.  The SEC filing cases that
10   you mentioned are -- are very persuasive I think on this score.
11   There's no alternative line of cases that support the line of
12   argument that counsel for the other side is advancing.

13       And, honestly, this case is even a little easier probably
14   than *Schindler Elevator*.  *Schindler*, the question was:  Well, what
15   really is public -- you know, is it public when -- you know, when
16   there's FOIA and does a gatekeeper decide if it's public or not.

17       With patent prosecution records that are posted to public
18   PAIR, you don't need the gatekeeper.  As you rightly noted, the
19   Agency is abiding by a regulatory obligation to disclose
20   everything.  It is public.

21           THE COURT:  Well, there's not -- it wasn't produced --
22   *Schindler* is easier because it was clearly a report by someone in
23   the United States Government.  So --

24           MR. HOFFMAN:  The SEC -- the SEC filing is an example of
25   -- every --

1          THE COURT:  Well, and the Supreme Court hasn't touched

2     on that yet, but we'll see where that goes.    But it's an

3     interesting problem.    So what you're saying is -- Yes, you're

4     right, Judge.  He's right -- that what Congress ended up buying

5     off on is that despite the language of romanette (i), if someone

6     finds anywhere in PACER information, they can't use it to file a

7     *qui tam* action?

8          MR. HOFFMAN:  We haven't argued that.

9          THE COURT:  I know you haven't argued that, but that is

10    the necessary implication of -- you would agree that there's no

11    material distinction with that respect; right?

12         MR. HOFFMAN:  I accede to Your Honor on the point.

13         THE COURT:  Okay.  Great.  I'm not sure what it gets me,

14    but it's just as well.  It's bizarre.  It's bizarre.

15       Because my instinct is yours, frankly, that Congress did a

16    very narrow thing in a case where the Supreme Court had

17    interpreted very broadly the word "report" already, in which --

18    after that, the Supreme Court interpreted it very broadly.  I

19    don't -- I don't know that just because there is this very broad

20    interpretation of what "report" means that Congress's narrow

21    change to the previous subsection means that I interpret "report"

22    differently.  That's your argument you two. I guess I understand.

23         MR. ROYALL:  Your Honor, could I be heard?

24         THE COURT:  Sure.  If you have something important to

25    add.

34

1          MR. ROYALL:  I don't know how important it is, but --

2          THE COURT:  Only add things that are important.

3          MR. ROYALL:  Adamas' counsel acceded to your position.

4   I'm not sure of what.

5          THE COURT:  He doesn't either.

6          MR. ROYALL:  For the record -- excuse me -- this is Sean

7   Royall for the Allergan Defendants.  The one thing I would note --

8   I have not studied PACER carefully, so I don't know that I'm

9   prepared to say -- or take a position on whether we view them as

10  indistinguishable.

11      The one thing I would say that we -- in preparation for this

12  hearing that we did look at carefully is whether we saw any

13  distinction between PAIR and EDGAR, the SEC site, which is the

14  subject of those cases that have found EDGAR to be a government

15  report.  And one thing that we noted as we looked at that question

16  is that there are government regulations -- and you may have

17  alluded to this earlier -- but there are government regulations

18  that not only require the PTO to publish this information but also

19  establish a process by which the agency -- a process the agency

20  must follow, including provisions saying that the Director of the

21  PTO has some discretion in determining what materials are and are

22  not published.  And that's -- the cite I have is 35 U.S.C. 122.

23          THE COURT:  Sure.  Let me ask you a question about EDGAR

24  because I haven't done securities law since I became a judge other

25  than when the judges do so, we have to look at EDGAR.

1      EDGAR -- what I know about it is the companies file their

2  10-Ks and their 10-Qs and their this and their that on it.  Do

3  they file any applications to the Securities and Exchange

4  Commission for an action?  You know, is there a -- when they --

5  when they want to file for approval of a proxy statement, do they

6  file that application on EDGAR?  When they want to file for -- you

7  know, what I'm trying to figure out is is this distinction

8  meaningful or what?  Because what Counsel says is that in an SEC

9  case, it's not -- it's not an administrative proceeding.  All it

10 is is you're filing a report because you're obligated to file a

11 report and it's obligated to be public.

12     It's very clear that proceedings before the PTO we can

13 reasonably characterize as some kind of administrative proceeding

14 because there's a -- they're applying for something and they're

15 going back and forth and that sort of thing.  Is there anything in

16 EDGAR other than just filing naked reports?

17     Come on, somebody at Gibson Dunn or somebody must be a

18 securities lawyer.  I don't know.

19          MR. ROYALL:  I don't have a definitive answer to that,

20 Your Honor.  It's a good question.  But the point that -- one

21 point I was making is it may be a case of distinguishing PAIR and

22 PACER that there is delegated discretion to the Director of the

23 PTO to curate, if you will, or organize and determine what is and

24 isn't published on the public PAIR where that doesn't exist with

25 PACER and PACER is more of a -- just an automatic republication of

1    things that are -- and that may be a distinction of matters given

2    other things that arise in the case law and --

3         THE COURT:  Maybe.  And it's hard.  It's more

4    complicated than that because some things in PACER you can't

5    publish and you have to take account of that and so it's somewhat

6    discretion.  Because the FOIA example is not about discretion at

7    all.  It's just about an obligation.  It was a curation of sorts

8    and you have to decide what can and cannot be published.  But that

9    might just be -- okay.  It might be the same in PACER.  I just

10   don't know.

11        MR. ROYALL:  The other thing I know -- just while I have

12   the microphone turned my way -- is we haven't yet talked about --

13   and I want to make sure we don't lose sight of the news media

14   channel as well as an independent basis for this material to be

15   found to constitute public disclosure.

16        THE COURT:  I sort of lost sight of it.

17        MR. ROYALL:  You lost sight of it?  Well, we -- we

18   briefed it --

19        THE COURT:  No.  I know you did.

20        MR. ROYALL:  -- and taken a position.  I know that the

21   other side cites I believe an unpublished District Court decision

22   that actually in dicta suggests that something else may not be --

23   constitute news media as published --

24        THE COURT:  Well, I actually thought that was a very

25   thoughtful -- thoughtful opinion by a very smart judge.  But --

1  but the fundamental question I have is nobody thinks that -- in a

2  practical sense, nobody thinks that the EDGAR site is news media.

3  Nobody.  Congress didn't intend that to be news media.  Congress

4  didn't intend for PTO's website to be news media.

5      That just doesn't make any sense.  And there was a little

6  piece in the judge's analysis that was aimed at that question, is

7  -- it has to actually have something to do with what people would

8  understand to be the language of the statute, not just anything

9  that's out there.  Everything on the Worldwide Web is news media?

10  I mean, that's -- that's essentially your argument.

11          MR. ROYALL:  Well, no.  I don't -- you don't have to go

12  that far to rule for us on that, Your Honor.  I agree that the --

13          THE COURT:  Any publicly accessible website.

14          MR. ROYALL:  Well, that -- the court in the *Integra*

15  case, I think they posed that question because there were -- I

16  think the defendants in that case may have argued maybe more

17  strongly than they needed to --

18          THE COURT:  But I don't know -- I don't know where the

19  stopping point is; right?  What's the stopping point that is news

20  media that makes the difference for the definition in the --

21          MR. ROYALL:  That -- that decision -- and I do agree

22  it's certainly thoughtful or thought-provoking -- the Court

23  suggested there are a few touchstones that you might consider and

24  one is whether information might be considered newsworthy.  But it

25  was also quick to say it clearly goes beyond the court in that

1    decision.  It clearly goes beyond traditional news outlets.  And

2    so that's just how far -- I agree with you that anything on the

3    Internet might be going too far, but you don't need to go nearly

4    that far --

5            THE COURT:  Well, but you have to go to any Government

6    website -- any publicly accessible Government website.  That's

7    just --

8            MR.  ROYALL:    That  is  providing  news,  updates,

9    information that is noteworthy at least to some audiences.

10           THE  COURT:   Government's  websites  all  think  they're

11   doing that.  That's what they do.

12           MR. ROYALL:  And perhaps all Government websites would

13   be encompassed.  But you don't have to go as far as to -- the

14   websites that are like private, confidential --

15           THE COURT:  Okay.  Well, take out the confidential ones.

16           MR.  ROYALL:   -- materials that were at issue in that

17   case.

18           THE COURT:  We'll still have an amazing array anywhere

19   on the Worldwide Web of many public websites.  They have lots of

20   things.  It's just an interesting -- I'd be reluctant to get --

21   you know, to have -- especially when they wrote the word "news

22   media," which those words weren't even -- those are older words.

23   So those aren't 2010 words.  Those are -- when was this section

24   drafted?

25           MR. ROYALL:  No, but it was -- but Congress updated --

1          THE COURT:  Right.

2          MR. ROYALL:  -- the statute and did not change those

3   words in 2010.

4          THE COURT:  Well, yes, but I -- it's hard to say that

5   they -- it's a little bit of a stretch to say they, therefore,

6   managed -- would sweep in an entire modern understanding of their

7   information that it comes from.  Maybe.

8          MR. ROYALL:  But we -- but we do agree you don't need to

9   reach that issue.  We believe that the Government reports --

10         THE COURT:  I think it's a harder issue for you, a much

11  harder issue for you.

12         MR. ROYALL:  The Government reports prong we think is

13  more than amply broad as stated in *Schindler* to cover this type of

14  information.  And in briefing, Relator has argued that there's

15  something in *Schindler* that suggests that to be a Government

16  report, the information has to -- has to be more actively

17  organized and -- or synthesized by a Government party, but

18  actually that argument was rejected.  That was something that the

19  Court of Appeals said that was reversed by *Schindler*.  *Schindler*

20  signals a quite broad concept of Government "reports" and we think

21  it's certainly broad enough to encompass the public PAIR database.

22         THE COURT:  So can we talk a little bit about original

23  source --

24         MR. SINGH:  Yes, Your Honor.

25         THE COURT:  -- because that's I think a very hard issue

1   for you.

2         MR. SINGH:   Your Honor, we tend to agree that it's a

3   harder issue for us.   I think that there are -- so to get at the

4   original source question, I'll say our original source question is

5   arguments are better vis-a-vis Allergan than Adamas, and it

6   depends -- well, it depends a little bit on what you conclude was

7   publicly disclosed if you're going to conclude anything was

8   publicly disclosed.

9         Let me take just a moment to talk about the Adamas argument

10  about the Amneal answer -- let me just run through this.   So they

11  submitted this declaration, the Portelli declaration, which had

12  two exhibits on it.   These were their information disclosure

13  statements.   And the first one is a 202-page document and the last

14  40 or so are just a list of 700 documents that Adamas sent to the

15  PTO.   And all it is literally is a list of stuff.

16        So if you look at page 193 of that PDF, you'll find line

17  items 540 and 542 and all they are is the title, you know,

18  Amneal's answer, Amerigen's answer.   They don't actually give the

19  allegations of fraud in that document.

20        If on PAIR you try to get documents 540 and 542, you can't do

21  it because on PAIR, those will show up on the docket.   They will

22  just be listed as non-patent literature.   That's the only

23  information about them.   If you click the hyperlink, it will say

24  that's not available on PAIR.   You have to petition to get a

25  certified copy of it from the Patent Office if you want it.

1        So if they're going to say that PAIR is where the allegations

2   are publicly disclosed, I think that statement is just honestly

3   flat --

4           THE COURT:  Well, so why is that different?  So you can

5   get it, though.

6           MR. SINGH:  You can --

7           THE COURT:  You can get it from the Patent Office.  Why

8   does it matter that you can't click on the hyperlink and with

9   respect to some of the documents, you have to write them a letter

10  and get it?

11          MR. SINGH:  Well, I would -- I would just say to the

12  extent that their argument --

13          THE COURT:  It's more like FOIA.

14          MR. SINGH:  Well, only if it was actually gotten that

15  way. I think the argument -- the argument would be, Your Honor, if

16  there was information --

17          THE COURT:  No, no.  Not -- it's not whether it's

18  actually done that way.  It's whether it could be gotten there.

19          MR. SINGH:  I'm not sure, Your Honor.

20          THE COURT:  It's available from a public source.  It

21  doesn't matter how it's actually gotten.

22          MR. SINGH:  So, Your Honor, I don't think it is the case

23  that all information in the Government's possession that is

24  potentially retrievable by request counts as information that's

25  been publicly disclosed already.  I think after the request is

1   made and the information is retrieved, then you would say it's

2   been publicly disclosed.  But -- and that's *Schindler*.

3   　　　　THE COURT:  So is that right?  Is he right?  You can't

4   get -- you said the exact opposite in your papers -- that for

5   these exhibits, which are the answer and the counterclaims are

6   accessible on PAIR.

7   　　　　MR. HOFFMAN:  We didn't say that in our -- he's correct

8   in how he's characterizing --

9   　　　　THE COURT:  Oh, so they're not accessible.

10  　　　　MR. HOFFMAN:  They are accessible via PAIR if you get to

11  the non-patent literature.  That's still a part of the patent

12  prosecution file.  That's a matter of public record.  And all you

13  have to do is --

14  　　　　THE COURT:  Write in for it.

15  　　　　MR. HOFFMAN:  Write in for it, be online, and there's a

16  nominal fee.  I don't know how distinguishable that is from a FOIA

17  response.  They all have a nominal fee as well.  I don't think

18  that's a relevant --

19  　　　　THE COURT:  Well, but his point is he says you didn't do

20  that.  Well, maybe you did --

21  　　　　MR. HOFFMAN:  To our knowledge, no one's done that, Your

22  Honor.  The question for public --

23  　　　　THE COURT:  So you didn't do that?

24  　　　　MR. SINGH:  No, Your Honor.

25  　　　　THE COURT:  Really.  You never --

1      MR.  SINGH:   I  mean,  he  has  looked  in  the  patent
2  prosecution history for sure.

3      THE  COURT:  Did  you  look  at  the  complaint  and  the
4  counterclaim?

5      MR.  SINGH:   I  think  he  did  in  connection  with  the
6  original  litigation  maybe,  but  there's  no  (indiscernible)
7  allegations about that either way.  I mean, to the extent that's
8  relevant, Your Honor, that would make this a summary judgment
9  question to talk about later.

10     THE COURT:  Well, but I guarantee you if that's what the
11 summary  judgment  question  is,  we'll  just  go  ahead  and  do  that
12 summary  judgment  question.

13     MR.  SINGH:  No,  but  I  believe  he  got  it  from  PACER  and
14 that's what we would say.

15     THE  COURT:  Correct.

16     MR.  SINGH:  And  of  course  I  think  we'd  all  agree  that
17 PACER is not a qualifying public disclosure -- well, I say it,
18 but --

19     THE COURT:  We don't -- you agree with yourself on that.

20     MR.  SINGH:  Yes.

21     THE  COURT:  So answer that question then.

22     MR.  HOFFMAN:   I'm not sure I follow what the question
23 is, but the --

24     THE  COURT:  The question is so it is available in some
25 sense, but he didn't get it from there.

1          MR. HOFFMAN:  That's --

2          THE COURT:  And he's not charged with knowledge of

3    everything that is everywhere.

4          MR. HOFFMAN:  The statutory touchstone for what serves

5    as a public disclosure bar is whether information was available to

6    the Government to enable them to initiate their own investigation

7    into the wrongdoing.  It doesn't matter -- this is the *Graham*

8    *County* case from 2009 from the Supreme Court -- where they are

9    construing this same provision, which said that it doesn't matter

10   -- what matters is what's publicly disclosed, not whether it

11   landed on the desk of a DOJ lawyer.

12         THE COURT:  Well, it's a report issue and this is a

13   narrower question.  This is a narrower question.  This is actually

14   not about public disclosure.  This is about whether it's a report.

15   And arguably, everything up on the PAIR website is a report that

16   it's out there, it's published by the Government.

17         MR. HOFFMAN:  Right.

18         THE COURT:  This is not on the PAIR website.

19         MR. HOFFMAN:  And to that, I would respond --

20         THE COURT:  And so it's not published by the Government,

21   so it's not a report.  That's his argument.

22         MR. HOFFMAN:  And my response -- I'm sorry, Your Honor.

23         THE COURT:  Go ahead.

24         MR. HOFFMAN:  My response to that argument is that

25   Adamas' information disclosure statements which attach that

1   information, that those are federal reports in the same way that

2   an SEC filing is a federal report.

3           THE COURT:  Well, so the -- so the IDS, did it have

4   copies of these documents?

5           MR. HOFFMAN:  Certainly, and that's required by statute.

6           THE COURT:  Well, okay.  Well, why isn't that --

7           MR. SINGH:  Because, Your Honor, what makes the SEC

8   filing a federal report is not -- it's not the report that gets

9   submitted.

10          THE COURT:  So stop it.  You're not answering my

11  question.  The IDS, the information disclosure statements, have

12  copies of these documents attached; right?

13          MR. SINGH:  Yes.

14          THE COURT:  And those are available on PAIR?

15          MR. SINGH:  No.  The attachments are not available on

16  PAIR.

17          THE COURT:  So the attachments are not available on

18  PAIR.  Why does it matter?

19          MR. HOFFMAN:  That's because those submissions to the

20  PTO are a federal report.  They're a formal written submission to

21  a federal agency.

22          THE COURT:  Yes.

23          MR. HOFFMAN:  They give information.  They summarize

24  facts for the agency and they're available to the United States

25  Government.  That's the question.

1          THE COURT:  And do they summarize the fraud in the PTO

2    notice?

3          MR. HOFFMAN:  Not only do they summarize the fraud in

4    the PTO -- so, first of all, it's important to understand that an

5    information disclosure statement, its contents are defined by

6    federal regulation.

7          THE COURT:  I agree with you with that.

8          MR. HOFFMAN:  So the IDS includes both the list and the

9    attachments.  That is submitted by Adamas to --

10         THE COURT:  Okay, but the attachments are not available

11   on PAIR, just the list; right?

12         MR.  HOFFMAN:   That   is  correct  and  some  of  the

13   attachments  but  not  the  attachments  that  include  the  express

14   allegations of fraud that are at issue here.

15         THE COURT:  Right, but so you have to drill down if

16   you're relying on the IDS.  If you wanted to see it, you'd have to

17   drill down the attachments; right?  It's not in the list.

18         MR. HOFFMAN:  They're on the list.

19         THE COURT:  I understand that.

20         MR. HOFFMAN:  But they're attached to the document.

21         THE  COURT:   The  allegations  of  fraud  are  not  on  the

22   list.

23         MR.  HOFFMAN:   That's  correct.   The  documents  are

24   attached as part of the IDS, and I should mention that there is a

25   requirement -- 37 CFR 1.97, "An IDS and its attachments shall be

1  considered by the Office."  This is also what distinguishes this

2  situation from the PACER database.  The Patent Office is obligated

3  -- legally required to review the IDSs that we submitted.  It put

4  them fully on notice --

5          THE COURT:  And they did.

6          MR. HOFFMAN:  And they did.  They certified to it and

7  that's -- he is obviously -- he was referring to the documents

8  that were mentioned earlier.  That's not true about PACER. There

9  is no requirement that anyone in the Federal Government will sit

10  down and read everything on PACER.  That's the -- that's what

11  distinguishes this.

12          THE  COURT:  Well,  it  was  distinguished  --  it's

13  different.  But why is it different within the meaning of the case

14  law about what a report is?

15          MR.  HOFFMAN:  Well, a "report's" been defined broadly

16  that it could be anything that gives information.  And -- and all

17  of the case law that has looked at this question -- if you -- case

18  law is uniform, Your Honor.

19          THE COURT:  But they haven't required the Government

20  look at the documents to make the report, so that --

21          MR.  HOFFMAN:  No, that's -- this is an easier case.

22  This is much easier.

23          THE COURT:  Well, I don't know easier.  If it doesn't

24  matter, it doesn't matter.  If it's irrelevant whether or not the

25  Government looked at it, it's not an easier case or a harder case.

1    It's irrelevant.

2              MR. HOFFMAN:  Well, it's relevant to whether -- you

3    know, I think what was in Congress's mind, if you're going to go

4    beyond the plain, unambiguous text of a statute, like a federal

5    report -- a federal report as defined by the *Schindler* case, and

6    you're going to start to consider whether Congressional intent in

7    amending subsection (i) of the public disclosure bar influences

8    the text of (ii), then you have to look at Congressional intent.

9         But Congress's intent was to make sure that these provisions

10   were striking the right balance to make sure that the Government

11   was actually being put on notice or had an opportunity to see the

12   information.   That's what matters.   That's why they changed

13   subsection (i) because there was insufficient assurances that the

14   Federal Government would actually be looking at cases on PACER or

15   civil litigation matters where they weren't a party.

16        You don't have that concern with public PAIR.  You don't have

17   that concern with an IDS.

18             THE COURT:  Well, so I don't understand that because the

19   Federal Government is a party to every federal criminal case.  The

20   Federal   Government   is   --   is   involved   in   every   federal

21   administrative hearing, every federal administrative hearing.

22        So I guess I'm not really understanding what you're saying.

23             MR. HOFFMAN:  I'm saying that Congress -- I don't think

24   we need to ever even consider the changes that were made to

25   subsection (i).  I'm considering subsection (ii) --

1          THE COURT:  No.  I understand that.

2          MR. HOFFMAN:  -- because Congress would have amended it

3   if they wanted to change its scope after the *Schindler* case.  But

4   if you are going to consider Congressional intent and whether the

5   Congressional intent in amending one subsection of the statute

6   impacts another seemingly less unrelated subsection of the

7   statute, what was important to Congress was, you know, Are we

8   calibrating this public disclosure source to give us adequate

9   assurances that someone in the Government might actually run

10  across this information.

11      And so with subsection (ii) with these IDS reports where

12  there's a federal regulation that says, You, Federal Government,

13  you, Patent Office, must read these, I think that's relevant to

14  determining what Congress's intent was and it's probative of why

15  you shouldn't even -- that this intent argument about how Congress

16  kind of backdoor amended the scope of the report prong is

17  misguided.

18          THE COURT:  Okay.  So we sort of got sidetracked here.

19          MR. SINGH:  Yeah, so --

20          THE COURT:  Back to the original source.

21          MR. SINGH:  Right.  So just to fill that out, I mean, I

22  think part of the question is whether you conclude that those

23  allegations in the IDSs were publicly disclosed.  We don't think

24  they were.

25          THE COURT:  Okay.  If they were --

1          MR. SINGH:  If they were, then I don't think we have a

2 very good original source argument vis-a-vis those allegations.

3          THE COURT:  All right.

4          MR. SINGH:  Federal.

5          THE COURT:  Right.

6          MR. SINGH:  Our original source argument comes down to

7 an argument that I'll admit is against the weight of the pre-

8 amendment precedent --

9          THE COURT:  Right.

10          MR.  SINGH:    --  which  is  that  the  application  of

11 expertise  can  in  some  circumstances  make  somebody  an  original

12 source.

13          THE COURT:  Yes.

14          MR. SINGH:  The change Congress made to the statute in

15 2010 was they took the word "direct" out.  You no longer need to

16 have  direct  knowledge  of  the  fraud.    You  need  independent

17 knowledge  that  materially  adds.    And  by  taking  out  "direct,"

18 specifically what Congress was trying to do was open up the False

19 Claims Act to people who didn't have firsthand knowledge -- more

20 outsiders than similar.

21          THE COURT:  Well, but that means it does -- it still has

22 to be independent of the publicly available source.  And that's

23 where I think the flaw is in your argument.

24          MR. SINGH:  So I think --

25          THE COURT:  Just because you've got some smart patent

1    lawyer who can read a patent file, you know, there's a million of

2    those people.

3            MR. SINGH:   Your Honor, that's -- that's correct.   I

4    really think the "There's a million of those people" line of

5    thought is exactly what -- what matters here because that comes to

6    whether it materially adds to what's in the public domain.   And I

7    think that -- so that's a decision you would have to make.

8            THE COURT:   No.   It's just that I don't think --

9            MR. SINGH:   But, Your Honor, we're acknowledging this is

10   a difficult argument and I don't want to press it too hard.   We do

11   think, though, that we have a very strong rifle shot argument that

12   this was not publicly disclosed because PAIR --

13           THE COURT:   Well, I think (indiscernible) and I think --

14   I think it's the hardest piece.

15       Okay.   Anything else you want to talk to me about because

16   that's all I wanted to talk about.

17           MR. HOFFMAN:   Can I add something on original source?

18           THE COURT:   Oh, yeah.   Sure.   Sure.   You're winning that

19   argument, so --

20           MR. HOFFMAN:   Well, I would just point out that --

21           THE COURT:   Discretion may be the better part of --

22           MR. HOFFMAN:   Well, I'm going to just say, since I'm

23   already out on this plank, --

24           THE COURT:   Go ahead.

25           MR. HOFFMAN:   -- that there are courts that have come

1   down and interpreted the public disclosure bar and the original

2   source exception since it was amended and they continue to hold

3   that -- you know, that your specialized expertise and your subject

4   matter expertise isn't enough to make you an original source.

5           MR. ROYALL:  If I could add one thing on the original

6   source.

7           THE COURT:  Yes.

8           MR. ROYALL:  Sean Royall for the Allergan Defendants.

9   Just -- we do think this is straightforward.  We think really Your

10  Honor can be guided by two Ninth Circuit decisions.  We have the

11  *Amphastar* case that says independent -- clearly, it has meaning.

12  And what it means is that the relevant information -- the Relator

13  had the relevant information before the public disclosure.  That's

14  not something that Relator can satisfy, but it's fairly notable

15  that Relator does not address the independent requirement of their

16  original source in briefing at all.

17      Relator ignores that and we think that's because there's not

18  a -- there's not a basis to satisfy the Ninth Circuit law

19  requirement.

20          THE COURT:  That's a difficult argument.

21          MR. ROYALL:  And then the other case is just the *A-1*

22  *Ambulance* case, and I know that Mr. Singh is being very

23  forthcoming about their argument, but their argument is that

24  somehow that -- because they concede that under *A-1 Ambulance* and

25  that law, they lose on this.  And so they -- they want to argue

1   that somehow the 2010 amendments make that no longer good law, but

2   we don't -- there's not a basis for that argument and they wish it

3   were so, but we don't think it's correct and the other circuit

4   courts have continued to hold that expertise is -- is not enough

5   to -- as I understand their argument, they're not very direct

6   about it, but what they're trying to suggest is that they can

7   satisfy the "materially adds" language from the amended original

8   source exception by pointing to expertise.

9       But the statute as revised says that the Relator must have

10   knowledge that is independent of and materially adds to the

11   publicly-disclosed allegations or transactions.   They're not

12   referring here to expertise in patent law.   They're talking about

13   facts, knowledge of facts, material knowledge that adds to the

14   basis of the facts, and there's nothing -- nothing here.   They're

15   not suggesting that at all.   They're just referring to his legal

16   expertise.

17       THE COURT:   Uh-huh.   Mr. Singh, did you want to add

18   anything?

19       MR. SINGH:   Yeah.   So I think the -- on that point, Your

20   Honor, I think -- they're framing the debate exactly correctly.

21   It is about whether you would regard expertise as a form of

22   independent knowledge that materially adds.   And within the

23   statute when they changed that, we understand it's a hard

24   argument.

25       I want to go to I think the over-arching frame of just where

1  we close this question of the public disclosure bar.  You know, in

2  some cases -- and it looks like in this one -- it can kind of

3  become the tail that wags the dog a little bit and it's important

4  to recognize, I think, when you look at what Congress was trying

5  to do in 2010 broadly, this was amendments done as part of the

6  Patient Protection and Affordable Care Act.   Fraud in the

7  healthcare sector was a highly salient concern and Congress's

8  objective was bring more of these suits.  Get more of this

9  litigation in, which is why they lowered the bar.  They made other

10 amendments to the Act as well, but this is why they narrowed the

11 scope of the public disclosure bar.

12      And so when you're looking -- these arguments about purpose

13 and about striking the balance, that's partially correct.  But --

14 and this is an important part of the story -- which is that in

15 these specific amendments, Congress had one objective.  Get more

16 of these cases in, and that was including by narrowing the scope

17 of the hearings that were going to qualify and it must follow we

18 think, as Judge Gutierrez very precisely points out, that you

19 can't undo that narrowing through romanette (ii) or romanette

20 (iii).   And I think that that's just a critically important

21 argument.

22      And I will say also there's a framing that goes on in some of

23 these cases that I find to be -- to be really rather unfortunate,

24 which is the tendency to call the Relator a parasite and an

25 opportunist.  And I will just point out that in order to make any

1   money out of any case like this, first we must show that the

2   Defendants defrauded the Federal Government and took money to

3   which they were not entitled.  And so I find that, you know, it's

4   a challenging frame to be in the position of having to sort of

5   defend the character of someone who's been an honest person his

6   whole life and who has found fraud and brought a claim to address

7   that fraud on the Government's behalf.

8        You know, I think it's important to keep in mind that

9   Congress also understands these issues that way and that's what it

10  was doing in 2010.

11           THE COURT:  I have no problem with Relators bringing

12  these case.  I have no problem with the Relator bringing this

13  case.  The question is whether the statute allows it.  Sole

14  question.

15           MR. SINGH:  That's exactly correct, Your Honor, and we

16  think Congress intended to allow it.

17           THE COURT:  Sole question.  I don't think they do, they

18  don't.  I don't get -- you know, my moral judgments, I leave them

19  at the door -- most of the time.

20       So -- anything else anyone would like to add on any subject?

21           MR. HOFFMAN:  (Inaudible) Judge Gutierrez's case, I

22  believe that was certified interlocutory (inaudible) small -- a

23  minority of --

24           THE COURT:  Well, --

25           MR. HOFFMAN:  (Inaudible).

1          THE COURT:  The Ninth Circuit took --

2          MR. HOFFMAN:  The Ninth Circuit (inaudible).

3          THE COURT:  All right.  But it went -- how long ago did

4  they take it?

5          MR. HOFFMAN:  It just happened.

6          THE COURT:  It just happened.

7          MR. SINGH:  In the last --

8          MR. HERRERA:  November 20.

9          THE COURT:  Ah, so they'll decide it November '20, next

10  year, if we're lucky.  Okay.  Well, we can't wait that long.

11  Well, thank you very much.  It was a really interesting case and

12  it was really an interesting argument and it's unfortunate that

13  you're all such great lawyers because it makes me not want to

14  dismiss the case, but I'll do it if I have to.

15          MR. SINGH:  You don't have to.

16          THE COURT:  I'm going to decide this before we do.  I'm

17  going to stay all discovery until I decide this, but we're going

18  to decide this pretty quickly.  If I deny the motion, then I'll

19  open discovery and we'll set a schedule and get it all done.

20          MR. SINGH:  Thank you, Your Honor.

21          THE COURT:  But I'm going to do this first.

22          ALL:  [Thank you, Your Honor.]

23          THE COURT:  Thank you.

24          THE CLERK:  Court stands in recess.

25  //

57

1          (Proceedings adjourned at 3:43 p.m.)

2

3          I, Peggy Schuerger, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    provided to me of the proceedings in the above-entitled matter.

6

7    _____          December 31, 2019
     Signature of Approved Transcriber        Date

8

9    Peggy Schuerger
     **Ad Hoc Reporting**
10   Approved Transcription Provider
     for the U.S. District Court,
11   Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25